While it is true that "[i]n certain circumstances a defendant may clearly demonstrate an acceptance of responsibility even though he exercises his right to trial," *United States v. Kraig*, 99 F.3d 1361, 1371-72 (6th Cir. 1996), adjustments for acceptance of responsibility under such circumstances are "rare." *United States v. Mahan*, 190 F.3d 416, 427 (6th Cir. 1999). In the instant case, Khalil disputed most elements of the government's case against him. While he did admit to two instances of marijuana distribution, he consistently denied responsibility for any other criminal activities in connection with the Avengers organization, including the attempted assaults on the Iron Coffins. In light of these facts, we conclude that the district court's refusal to apply a downward adjustment pursuant to § 3E1.1 was supported by the preponderance of the evidence, and should therefore be upheld.

### III.

For the foregoing reasons, we **AFFIRM** the defendant's conviction and sentence.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0048P (6th Cir.)
File Name: 02a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

*v.*

THOMAS MICHAEL KHALIL,
    *Defendant-Appellant.*

No. 00-3626

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 99-00321—Peter C. Economus, District Judge.

Argued: November 2, 2001

Decided and Filed: January 9, 2002[*]

Before: KEITH, BOGGS, and MOORE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Robert M. Morgan, Detroit, Michigan, for Appellant. Patrice M. Mulkern, UNITED STATES DEPARTMENT OF JUSTICE, ORGANIZED CRIME &

---

[*]This decision was originally issued as an "unpublished decision" filed on January 9, 2002. On January 30, 2002, the court designated the opinion as one recommended for full-text publication.

RACKETEERING SECTION, Washington, D.C., for Appellee. **ON BRIEF:** Robert M. Morgan, Detroit, Michigan, for Appellant. Patrice M. Mulkern, Frank J. Marine, UNITED STATES DEPARTMENT OF JUSTICE, ORGANIZED CRIME & RACKETEERING SECTION, Washington, D.C., for Appellee.

————————

## OPINION

————————

KAREN NELSON MOORE, Circuit Judge. Thomas Michael Khalil, was convicted of conspiring to conduct the affairs of an organization through a pattern of racketeering, attempting to commit a violent crime in aid of racketeering, and two counts of distributing marijuana, in connection with his role as national president of the Avengers Motorcycle Club. The district court sentenced him to sixty months' imprisonment followed by supervised release for a term of three years. Khalil appeals his conviction and the sentence imposed by the district court. For the reasons stated below, we **AFFIRM** the conviction and sentence.

## I.

On September 15, 1999, a federal grand jury returned a four-count indictment charging Thomas Michael Khalil, a.k.a. "Foot," with conspiring to conduct the affairs of the Avengers Motorcycle Club through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d); attempting to commit a violent crime in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(6) and 2; and with two counts of marijuana distribution in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). As part of the pattern of racketeering, the indictment charged the defendant Khalil with agreeing that two or more acts involving narcotics distribution, interstate transportation of stolen motor vehicles and goods, mail fraud, and illegal gambling would be committed by a coconspirator in conducting the affairs of the enterprise. The indictment stemmed from a four-year investigation of motorcycle gangs

### F.

Khalil also appeals the district court's denial of a mitigating role adjustment for acceptance of responsibility.[4] Khalil argues that he was entitled to an adjustment because he admitted to two acts of distributing marijuana to Frederick. Section 3E1.1 of the Sentencing Guidelines provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels." U.S.S.G. § 3E1.1. The district court found that an adjustment for acceptance of responsibility was not warranted, because Khalil still challenged the charges at trial and did not give a statement to the probation officer acknowledging guilt. In addition, the district judge agreed with the government's position that although Khalil agreed to some acts of marijuana distribution, he offered excuses for his conduct and motives.

As the commentary to § 3E1.1 explains, "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, comment, note 5. "Because it is generally a question of fact, the trial court's determination of whether a defendant has accepted responsibility normally enjoys the protection of the 'clearly erroneous' standard, and will not be overturned unless it is without foundation." *United States v. Castillo-Garcia*, 205 F.3d 887, 889 (6th Cir. 2000).

————————

[4] The defendant requested both a § 3E1.1 adjustment and a downward departure at sentencing. In his brief on appeal, Khalil also asserts that the district court erroneously refused to consider a downward departure for partial acceptance of responsibility. The district court's refusal to grant a downward departure, however, is not reviewable on appeal unless the court's refusal to deviate from the sentencing guidelines was based on the erroneous belief that it lacked the authority to depart. *See United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). Nothing in the record indicates that the district court's refusal to grant Khalil a downward departure was based upon such a belief. Therefore, Khalil cannot challenge that decision on appeal.

based upon his role as a leader or organizer. Section 3B1.1(a) of the Sentencing Guidelines provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by **4** levels." The district court determined that a § 3B1.1(a) enhancement was appropriate, because there was "ample evidence that the defendant as national president, was the moving party" behind the criminal activity of the Avengers Motorcycle Club. J.A. at 555.

Khalil argues that the evidence does not support a finding that the Avengers national organization, as opposed to merely the Lorain chapter, was involved in any criminal activity. Khalil also argues that there was insufficient evidence to show that he exercised any actual authority or organizational power over the Avengers membership. These are questions of fact. In reviewing the application of an aggravating role adjustment, the district court's findings of fact are reviewed for clear error. *United States v. Gort-DiDonato*, 109 F.3d 318, 320 (6th Cir. 1997).

We determine that the district court did not commit clear error in finding that Khalil had exercised actual authority over the Avengers members. Testimony at trial showed that Avengers members were required to follow the orders of club officers and would be disciplined or even physically attacked if they failed to obey. Substantial evidence was introduced at trial to show that Khalil had ordered assaults on the members of the Iron Coffins and that members of the Avengers were required to follow these orders. The government also presented evidence indicating that Khalil was involved in wide-ranging drug trafficking activities and directed the activities of a number of participants. Much of this evidence was in the form of the recorded statements of Khalil himself. Khalil can, at best, point to conflicting evidence regarding these propositions. The mere existence of a factual dispute, however, does not demonstrate clear error in the district court's findings.

operating in Lorain County, Ohio. Defendant Khalil's trial was consolidated with that of Ronald DeAngelo, a chapter president of the Avengers' club in Columbus, Ohio.

Khalil is the national president of the Avengers Motorcycle Club, a national motorcycle club divided into local chapters located in and around Michigan, Ohio, West Virginia, Indiana, and Illinois. The national headquarters is in Pontiac, Michigan. Avengers members identify themselves by wearing "patches" or "colors," which are articles of clothing bearing the insignia of the club. The organization has national bylaws and a constitution, and its hierarchy includes elected national, state, and local chapter officers. Testimony was offered at trial to show that Avengers members were required to follow the orders of club officers and would be disciplined or even physically attacked if they failed to obey.

At trial, the government introduced extensive evidence linking Khalil to drug trafficking activities in the Avengers organization. There was evidence indicating that Khalil supplied marijuana in pound quantities to a fellow Avenger, Michael Cristarella, for distribution to Avengers members in Ohio and others, including Dale Frederick. In September 1995, Frederick became an informant for the FBI after agents searched his home and found nine pounds of marijuana, which Frederick had received from Cristarella. Pursuant to the investigation, Frederick became a member of the Avengers and introduced undercover agent Donald Barker to the organization; Barker eventually became a member himself. Sometime in 1998, the relationship between Khalil and Cristarella broke down, at which point Frederick undertook to purchase drugs directly from Khalil. On November 24, 1998, and April 17, 1999, Khalil made two drug sales to Frederick, each involving approximately ten pounds of marijuana.

Evidence was also introduced at trial concerning contemplated acts of violence by the Avengers against a rival motorcycle club, the Iron Coffins. Witnesses described an ongoing feud between the Avengers and the Iron Coffins,

which arose in the early 1990s after a member of the Iron Coffins shot a member of the Avengers in Lorain County. After the shooting, the Avengers temporarily succeeded in driving the Iron Coffins out of Lorain County. In 1998, however, Iron Coffins members began to patronize local bars in Lorain County, wearing their club "patches" and bragging that they intended to open a chapter in Lorain. This led to discussions and plans by the Avengers to take action against the Iron Coffins.

On July 29, 1998, a group of Lorain County Avengers traveled to a local tavern in search of Iron Coffins members. The group was armed with a stun gun, a club, leather gloves with sand in the knuckles, and other weapons, and intended to assault the Iron Coffins, who they believed to be at the bar. On another occasion, on August 26, 1998, Avengers members met at the Lorain clubhouse, whereupon they split into two groups and went to separate bars in Elyria, Ohio, to find and assault members of the Iron Coffins. In both cases, however, Frederick and Barker tipped off local law enforcement, who established a presence at the bars and prevented an attack.

On November 21, 1998, a national meeting of Avengers chapter presidents was held, at which the tension between the Iron Coffins and the Avengers was a prominent topic. Khalil presided over this meeting, and encouraged members to take action against the Iron Coffins. Khalil chastised the Avengers members for not having taken action earlier in connection with their rivalry with the Iron Coffins, saying "I'm surprised I ain't heard somebody's got the first f***in' [C]offin's patch. I guess I'll have to go out and get it myself." J.A. at 634. On November 22, 1998, chapter president DeAngelo held a meeting with the Lorain County Avengers and told them that he was under pressure from Khalil, who felt that the local members were not doing enough to deal with the Iron Coffins. DeAngelo explained to the Avengers that "[w]e're at war with them." J.A. at 642.

Khalil testified at his trial. He admitted to the two distributions of marijuana to Frederick in 1998 and 1999, but

---

Everybody knows what Foot [Khalil] said last night, okay? . . . . You guys need to do what you need to do and that means all of you.

. . . .

I don't particularly agree with Foot [Khalil] on this whole thing but it ain't up to me to agree or disagree but I'm gonna do what I feel like I gotta do . . . .

J.A. at 637, 639. DeAngelo explained to the members: "Here's the deal. We're at war at with them f***ers that's what I'm saying. . . . What Foot [Khalil] said if you read between the lines . . . when you say f*** 'em up it means take their f***in' sh** whatever . . . that's what he's sayin." J.A. at 642-43. From this evidence, a rational jury could find that Khalil both participated in, and sought to bring about, an attempted assault on members of the Iron Coffins.

Khalil contends that he instructed the Avengers to limit their encounters with the Iron Coffins to verbal taunting, and to refrain from initiating any violence. While Khalil did advise the Avengers not to "put yoursel[ves] in prison," J.A. at 632, this statement was offered in the context of a suggestion that Avengers members might evade legal responsibility for a violent confrontation if they used verbal taunts to incite the Iron Coffins to strike first, and then claimed that they retaliated in self-defense. This statement appeared to be offered for the purpose of allaying members' concerns about criminal liability, not to discourage acts of violence. Moreover, Khalil's message was not consistent on this point. At one point, he explicitly directed the Avengers to "punch 'em, beat 'em up." J.A. at 632. When viewed against the totality of the evidence, Khalil's cautionary words do not foreclose the possibility that a rational jury could find him guilty of aiding and abetting the attempted assaults against members of the Iron Coffins.

### E.

Khalil next appeals the district court's application of a four-level enhancement to his offense level during sentencing,

must next consider whether there was sufficient evidence to find that Khalil aided and abetted these attempted assaults. "To be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed." *United States v. Martin*, 920 F.2d 345, 348 (6th Cir. 1990) (internal quotation marks omitted).

We conclude that there was sufficient evidence to sustain Khalil's conviction based upon an aiding and abetting theory of liability. Khalil's comments at the national presidents' meeting on November 21, 1998, clearly demonstrated that he wished to see an assault committed against the Iron Coffins.[3] As the national president of the Avengers, Khalil would have known that club members were likely to act upon his words. *Cf. United States v. Tijerina*, 407 F.2d 349, 355 (10th Cir. 1969) (finding sufficient evidence of aiding and abetting where leader of mob of demonstrators "supported and countenanced" the actions of the demonstrators in assaulting forest rangers during demonstration). Indeed, the evidence at trial showed that Khalil's comments were understood by the Avengers membership as a direct order to engage in violence against the Iron Coffins. In one taped conversation, DeAngelo explained to members of the Lorain chapter that they had no discretion to ignore Khalil's instructions:

---

[3] Apparently this meeting took place after the acts of attempted assault on the Iron Coffins cited by the government. This raises a question as to whether the defendant could be convicted on a theory of aiding and abetting for statements made after the unsuccessful attempt. This issue is not raised by Khalil on appeal, however, and we decline to consider it *sua sponte*. Nevertheless, we note that statements made by Khalil at the November 21, 1998, presidents' meeting provide some evidence that he had made earlier efforts to encourage assaults against the Iron Coffins. Comments at the beginning of the meeting suggest that the topic of the Iron Coffins had been discussed at previous meetings, and was apparently addressed in a letter sent to all the chapter presidents.

---

denied any other involvement with drugs or drug trafficking. Khalil asserted that he only agreed to supply Frederick with drugs after Frederick repeatedly hounded him to sell him drugs and played upon his sympathies concerning Frederick's diabetes and poor physical condition. Khalil denied involvement in any other criminal activity in connection with the Avengers organization, and denied ordering an assault on the Iron Coffins.

At the conclusion of the trial, the jury convicted Khalil on all counts and the district judge sentenced him to sixty months in prison. Khalil filed his timely notice of appeal on May 10, 2000.

## II.

### A.

The first issue raised by Khalil is whether the district court committed reversible error by admitting hearsay evidence during the government's redirect examination of FBI agent John Moran. This circuit has held that all evidentiary rulings of the district court, including its determination of whether testimony is inadmissible hearsay, are reviewed for abuse of discretion. *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999).

During his cross-examination of Agent Moran, Khalil's attorney suggested that the FBI had improperly targeted the defendant because he was the national president of the Avengers Motorcycle Club, and that FBI agents sent Frederick to entrap the defendant because their investigation was nearing an end and they had not obtained the necessary evidence to implicate Khalil.[1] On redirect, the government

---

[1] The following exchange occurred in cross-examination of Agent Moran:

Q:   So you're nearing the [end] of your investigation, you know that Tom Khalil is the national president of the Avengers motorcycle gang, and

asked Agent Moran whether he had "interviewed witnesses with regard to Mr. Khalil's activities in '97 and '98 through the Avengers," and whether he had previously had "discussions with other agents who were conducting investigations in this matter." J.A. at 418. Agent Moran answered affirmatively to both questions. The government then asked whether "based on all of that," Agent Moran had "an awareness as to whether Mr. Khalil was engaging in drug trafficking in 1997 and 1998 and prior." J.A. at 418-19. In response, Agent Moran stated that "Mr. Khalil was supplying marijuana and cocaine to the Avengers in Ohio and other locations in Michigan." J.A. at 419. The defense objected to this testimony. The government responded that this line of questioning was necessary to rebut the implication raised by the defendant that the FBI had improperly targeted Khalil in its investigation. The district court overruled the defendant's objection and admitted the testimony. Khalil contends that Agent Moran's testimony is inadmissible hearsay because it recounts the out-of-court statements of unidentified "witnesses" and "agents."

---

it's at that time in late '98 and '99 that you and Detective Barker decide we're going to have Mr. Frederick contact Mr. Khalil; isn't that the fact?

A:   No, sir.
. . . .
. . . . It was much earlier than that. I don't know the specific date.

Q:   But you're nearing the end of your investigation, are you not?

A:   My investigation, yes, sir.

Q:   And did you know at that time that you contacted Mr. Khalil, were you aware that you needed what's called two predicate acts? . . . .
. . . .

A:   Two, yes, sir.

Q:   And you sent Mr. Frederick out to get him involved in those drug transactions; that's true, is it not?

A:   Yes, sir.

J.A. at 394-95.

---

to local bars with the intention of engaging the Iron Coffins in a violent confrontation. On at least one of these occasions, the club members were armed. The evidence at trial, particularly the testimony of Tom Sam Hakaim who participated in the attempted attacks, was sufficient to establish specific intent. Hakaim agreed with the prosecution's characterization of these events as "attempted attacks," and admitted that the Avengers had gone out looking for the Iron Coffins on these two occasions.

Moreover, we conclude that these actions constitute sufficient "substantial steps" toward the commission of an assault against the Iron Coffins to sustain the jury's conclusion that an attempted assault occurred. The evidence demonstrates that, on the two occasions in question, club members organized themselves, armed themselves, and traveled in groups to locations where they expected to find their intended victims. We think that such actions sufficiently corroborate the Avengers' intent to commit an assault. *Cf. United States v. Shelton*, 30 F.3d 702 (6th Cir. 1994) (finding sufficient "substantial step" evidence for attempted robbery where defendant discussed plan to rob cashier with informant and was apprehended with a pistol in a parking lot while waiting for the cashier to leave the store); *United States v. Williams*, 704 F.2d 315, 321 (6th Cir. 1983) (finding sufficient evidence for "substantial step" where the defendant "actively solicited a narcotics sale by telephone and within a short time interval voluntarily appeared at the . . . residence with a weapon and a substantial amount of cash to consummate the purchase from the cache of cocaine"). The fact that the crimes were aborted due to police interference does not preclude a verdict of attempt. *See Williams*, 704 F.2d at 321 (finding sufficient evidence for attempt where "[i]n the absence of police intervention, [the defendant] would have consummated the same overt acts").

### 2.

Having determined that there was sufficient evidence to support the jury's finding that attempted assaults occurred, we

judgment of acquittal for insufficiency of the evidence at the close of all the proofs, appellate review is limited to determining whether there was a 'manifest miscarriage of justice.'" *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998). Even if the defendant had properly renewed his motion, however, he would still bear a "very heavy burden" in challenging the sufficiency of the evidence to sustain his conviction. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000). We will reverse a judgment for insufficiency of the evidence only if the judgment is not supported by substantial and competent evidence upon the record as a whole. *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992). The Supreme Court has explained that a jury verdict must be upheld if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1969) (emphasis in original).

**1.**

To establish liability for an attempt, the government must prove both specific intent to engage in the criminal activity and the commission of an overt act that constitutes a substantial step towards the commission of the crime. *See Price*, 134 F.3d at 350. The requirement of a "substantial step" is an objective one, under which the "appellate court evaluates whether any reasonable person could find that the acts committed would corroborate the firmness of a defendant's criminal intent, assuming the defendant did, in fact, intend to commit the crime." *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir.), *cert. denied*, 528 U.S. 844 (1999).

We conclude that the evidence presented at trial was sufficient to prove both specific intent and that a substantial step was taken towards commission of an assault against members of the Iron Coffins. The government introduced evidence at trial showing that on at least two occasions, members of the Avengers assembled into groups and traveled

Hearsay is defined as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). The record reveals that the challenged testimony was elicited in an effort to explain the basis for the FBI's decision to pursue the investigation of the defendant, and not to prove the truth of the matter asserted — i.e., that Khalil was actually engaged in narcotics trafficking in 1997 and 1998. If properly admitted for this purpose, Agent Moran's testimony was not hearsay. *See United States v. Pulley*, 922 F.2d 1283, 1288 (6th Cir.), *cert. denied*, 502 U.S. 815 (1991) ("If [out-of-court statement made to investigating agent] was offered to prove that [the agent] had good reason to continue his search of the house, it was not hearsay."). Although this testimony is still subject to exclusion if its unfair prejudicial effect outweighs its probative value, FED. R. EVID. 403, we conclude that the defendant "opened the door" to such testimony by placing Agent Moran's state of mind directly at issue. *See Pulley*, 922 F.2d at 1288 (holding that out-of-court statements were properly admitted to show customs agent's state of mind where defendant suggested that agent planted drugs during a search); *see also United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) ("When one party has 'opened the door' on an issue, by eliciting prejudicial or inadmissible testimony, an opponent, in the court's discretion, [may] introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." (internal quotation marks and citations omitted)). By suggesting that the government improperly targeted him due to his position in the Avengers and then ultimately entrapped him when it could not uncover legitimate evidence, the defendant invited rebuttal testimony from the government to explain why it proceeded with the investigation in the manner that it did. Agent Moran's testimony was therefore properly admitted as relevant nonhearsay testimony.

**B.**

In Khalil's second assignment of error, he contends that the district court improperly denied his request for a jury instruction on his defense of entrapment. "We review jury

instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). "A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Id*. The Supreme Court has explained that the defendant is entitled to an entrapment instruction "whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews v. United States*, 485 U.S. 58, 62 (1988).

A valid entrapment defense requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity. *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990), *cert. denied*, 499 U.S. 981 (1991). To be entitled to an entrapment instruction, the defendant must come forward with evidence to support both elements of the defense. *See id.*

Upon review of the record, we conclude that Khalil has made an insufficient showing to warrant an entrapment instruction. In particular, he presented insufficient evidence from which a reasonable jury could find a lack of predisposition. Predisposition "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63. This Circuit has identified a number of factors that are relevant in determining predisposition:

[1]    the character or reputation of the defendant, including any prior criminal record;

[2]    whether the suggestion of the criminal activity was initially made by the Government;

[3]    whether the defendant was engaged in the criminal activity for profit;

Moreover, jury instructions are not reviewed in isolation, but in context of the charge "as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a sound basis in law to aid the jury in reaching its decision." *Clark*, 988 F.2d at 1468. The judge's earlier instruction to the jury had made clear that a finding of guilt as to two predicate offenses was not, by itself, sufficient to warrant a conviction under RICO. In addition, the original instructions clearly stated that the two predicate offenses must be "in the conduct of the affairs of the enterprise through a pattern of racketeering activity." J.A. at 526. Therefore, the judge's instructions, taken as a whole, did not foreclose the possibility that the jury could find that the defendant engaged in marijuana distribution, but that this activity was independent of the criminal enterprise alleged in the RICO count.

## D.

Khalil asserts that there was insufficient evidence to sustain his conviction for a Violent Crime in Aid of Racketeering Activity (VCAR) under Count Two. Count Two charged the defendant with aiding and abetting an attempted assault[2] by members of the Avengers against members of the Iron Coffins. Khalil argues that the evidence presented at trial was insufficient for the jury to find either that an attempt to commit an assault was undertaken or that Khalil aided and abetted any attempt that might have occurred.

Khalil raised a Rule 29 challenge to the sufficiency of the evidence at the conclusion of the government's case, but he failed to renew that motion at the close of all the evidence. "[W]here, as here, a defendant does not renew his motion for

---

[2]The assault charge alleged a violation of OHIO REV. CODE ANN. § 2903.11(A), which provides that "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another . . . ; [or] (2) Cause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." (Banks-Baldwin West Supp. 2001).

*Now if that's the case, it's not necessary to consider the predicate acts under subsections B and C.*

J.A. at 544-45 (emphasis added). The judge explained to the jury that by repeating the portions of the charge, he was not "underlining or emphasizing the portions that I read to you over any other part of my instructions." J.A. at 544.

Khalil objects to the district court's re-instruction of the jury. According to Khalil, the judge's re-instruction *required* the jury to convict on the RICO charge if they found guilt as to marijuana distribution, even if they did not find that the separate elements of a RICO conspiracy were proved beyond a reasonable doubt. "The district court's actions in responding to questions from the jury are reviewed for abuse of discretion." *United States v. August*, 984 F.2d 705, 712 (6th Cir. 1992). "This circuit has set a high standard for reversal of a conviction on the grounds of improper instructions." *United States v. Sheffey*, 57 F.3d 1419, 1429 (6th Cir. 1995), *cert. denied*, 516 U.S. 1065 (1996). "A reviewing court may reverse a judgment only if the instructions, viewed as a whole, were confusing, misleading and prejudicial." *United States v. Clark*, 988 F.2d 1459, 1468 (6th Cir.), *cert. denied*, 510 U.S. 832 (1993).

We do not believe that the jury was misled. The wording of the jury's question reveals that they were not asking, as the defendant contends, whether a guilty verdict on the marijuana charges, without more, required a guilty verdict on the RICO charge. The question began with "[a]ssuming we agree on the 5 elements in count 1(a) . . . ." This is a clear reference to the independent elements which must be proved to establish RICO liability under Count 1(a), in contrast to the elements of the predicate offense itself. Viewed in this context, the judge's re-instruction merely informs the jury that if they find beyond a reasonable doubt that Khalil committed two predicate acts of marijuana distribution, *in addition to finding the independent elements required for RICO liability*, then conviction on Count One is warranted.

[4]   whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and

[5]   the nature of the inducement or persuasion supplied by the government.

*United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991). Where the evidence "clearly and unequivocally establishes that [the defendant] was predisposed," the district court is justified in denying an entrapment instruction. *Nelson*, 922 F.2d at 317; *see also United States v. Elder*, 90 F.3d 1110, 1135 (6th Cir. 1996), *cert. denied*, 519 U.S. 1131 (1997). In *Elder*, the defendant requested an entrapment instruction on the grounds that he was induced to commit the crime by a government informant, with whom he had developed an intimate relationship. This court found the denial of an entrapment instruction proper, because recorded conversations showed that the defendant discussed cocaine purchases with the informant before the relationship had begun. We also noted extensive evidence that the defendant had been involved in cocaine sale and transportation activities long before he met the informant. *Elder*, 90 F.3d at 1135.

At trial, the government advanced extensive evidence linking Khalil to drug trafficking activity. Frederick testified that before he became a government informant, he was aware of a dealer-supplier relationship between Khalil and Cristarella. A police officer testified that, in 1995, he observed Khalil giving a package of marijuana to Cristarella, who later distributed this package to Frederick. Most notably, the government offered numerous tape-recorded conversations in which Khalil describes his drug dealing activities, including his suppliers, prices, and profits, in great detail. For example, during one conversation, Khalil told Frederick that "the last pounds I had, I got rid of for 800 bucks a pound." J.A. at 608. He explained that "my people were selling 'em for 12 individually . . . . They were making 400 bucks a pound." J.A. at 608. Khalil further observed that the pounds in question were "good weed." J.A. at 608. Khalil's statements also indicated he was actively promoting

efforts by Avengers members to deal drugs, at one point telling Frederick "I want you to be able to work. I wanted some of my other people to deal so I did it for 'em. I got one guy five, one guy ten, another guy five, just so they got somethin'." J.A. at 625.

On appeal, the only evidence cited by Khalil to show an absence of predisposition is his own testimony at trial. However, Khalil did not dispute making any of the statements in the recorded conversations offered by the government. He claimed that, despite his acknowledged statements to the contrary, he never actually engaged in drug trafficking aside from the two transactions with Frederick. Khalil's only explanation for his numerous references to drug-related activities in the taped conversations offered by the government was that he made these statements to discourage Frederick from engaging in drug deals. The defendant did not offer any explanation as to why he believed that statements concerning the availability, price, and profitability of marijuana and cocaine might discourage Frederick. To the contrary, Khalil told Frederick "[e]verybody's makin' money man." J.A. at 610. In another conversation, Khalil told Frederick that he would supply a quantity of marijuana to Frederick for only fifty dollars over his own cost "to do you a favor." J.A. at 625. Nothing in the recorded conversations suggested any reluctance or hesitation on Khalil's part. Khalil's self-serving denial of the facts, without corroboration or credible explanation for his own incriminating statements, does not establish a sufficient factual predicate to warrant the requested instruction on entrapment.

## C.

In Khalil's next assignment of error, he asserts that the trial judge improperly re-instructed the jury in response to a question that arose during the jury's deliberation. During deliberation, the judge received the following question from the jury, which he read on the record:

"Assuming we agree on the 5 elements in count 1(a)" — I think they mean capital A — "against Mr. Khalil. If we

determine him guilty of 2 separate counts of interstate sale of marijuana, does that satisfy a guilty charge? Or must we find him guilty on charges 1(b) [transportation of stolen vehicles] and 1(c) [operation of an illegal gambling business]?" I think they mean capital B — A, B and C.

J.A. at 539. The judge apparently interpreted this question to ask whether the jury could find Khalil guilty of racketeering if it found guilt as to two acts of marijuana distribution, in addition to the five RICO elements, or whether the jury was required to find guilt as to each of the predicate offenses alleged in the RICO count. In response to this question, the judge attempted to clarify his earlier instructions:

Count 1 of the indictment charges . . . Khalil with conspiracy to participate in the affairs of an enterprise through a pattern of racketeering consisting of the following:

A, multiple offenses involving the distribution, manufacture and possession with intent to distribute a controlled substance or controlled substances.
B, acts relating to the interstate transportation of stolen motor vehicles.
C, acts relating to . . . an illegal gambling business.

I further instructed you that it was part of the conspiracy that the defendant, Thomas Michael Khalil, agreed that a coconspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

*Now, if you find that the government proved beyond a reasonable doubt that the defendant Khalil committed or agreed that another coconspirator committed two acts of racketeering under subsection A that I just read you, that would be sufficient to find the defendant guilty of Count 1.*