NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0134n.06
Filed: February 21, 2006

Nos. 04-5091, 04-5093

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| RICHARD NANEZ and | ) | MIDDLE DISTRICT OF TENNESSEE |
| KEVIN C. NEAL, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: BOGGS, Chief Judge, GIBBONS, Circuit Judge and ROSE, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Richard Nanez and Kevin Neal were convicted of violating 21 U.S.C. §§ 841 and 846 and each was sentenced to 240 months in prison. On direct appeal, Neal challenges his conspiracy conviction, claiming that (A) insufficient evidence supported his conviction; (B) the jury improperly rejected his entrapment defense; and (C) prosecutorial misconduct tainted his conviction. Neal also challenges his sentence. Nanez challenges only his sentence. For the following reasons, we **AFFIRM** Neal's conviction and his sentence but **VACATE** Nanez's sentence and **REMAND** his case to the district court for resentencing.

---

[*] The Honorable Thomas M. Rose, United States District Judge for the Southern District of Ohio, sitting by designation.

-1-

I.

Richard Nanez sold bags containing a half-gram of cocaine or less from his Houston, Texas bar. At his bar, Nanez met Rafael "Angel" Benavides around January 15, 2002 and discussed an ongoing drug sale in which Nanez would supply Benavides with three-to-five kilograms of cocaine per week. Because Nanez had never dealt in such large quantities, he had to locate a source before finalizing the deal. Nanez secured a source and quoted Benavides a price of $24,000 per kilogram. Benavides balked at the price, and Nanez cut it to $21,000 per kilogram. Benavides considered the counteroffer and told Nanez he would get back to Nanez about the deal.

Before Benavides could make a decision about the deal with Nanez, Benavides was arrested by Nashville Police and began cooperating with the government. Nashville Police joined its efforts with the United States Attorney for the Middle District of Tennessee. Benavides informed the police of his pending deal in Houston with Nanez, and the government began investigating Nanez.

Benavides called Nanez under the pretext of consummating the deal. He agreed to purchase three kilograms of cocaine from Nanez for $21,000 per kilogram if Nanez delivered the drugs to Nashville. The deal stalled when Nanez could not locate his usual courier. He assured Benavides that there would be no further delays and told him he was traveling to Nashville to insure that the deal would be completed. The logistics of delivery were worked out by Benavides and Nanez during several telephone calls, all of which were monitored by the government.

Nanez recruited two people for the Nashville drug deal: Mike Avila and Kevin Neal. Nanez hired Mike Avila to transport the cocaine to Nashville, concealed in the gas tank of his car. Nanez agreed to pay Avila $1,000 for every kilogram of cocaine he delivered and told him to anticipate

delivering five kilograms per week. Nanez hired Neal for $500 to share the driving responsibilities on Nanez's trip to Nashville.

Nanez and Neal arrived in Nashville before the cocaine was delivered. Neal met Benavides and an undercover police detective, Jesse Burchwell in a McDonald's parking lot. Benavides was wearing a body wire, and he and Burchwell were communicating with Assistant United States Attorney ("AUSA") Sunny Koshy. Neal waited at his hotel room at the Shoney's Inn. By this time, he had discerned the purpose of the Nashville trip, and both he and Nanez were upset that the delivery was late.

The following day, Nanez and Neal arranged another meeting with Benavides and Burchwell at a Longhorn Steakhouse. The cocaine still had not arrived. Nanez told Benavides and Burchwell that his driver was running late because he had made other drug drops en route from Houston. Burchwell began to question whether the deal would be completed, and Neal assured him that it would. Neal and Nanez also began discussing future deals with Benavides and Burchwell. Nanez told them that they would have to order at least five kilograms of cocaine in the future to get better prices. Both Nanez and Neal quoted prices in the range of $17,000 to $19,000 per kilogram. Neal also discussed marijuana dealing and plans to get his drug-dealing business with Nanez off the ground. He indicated to Burchwell that he was going to buy a GMC Yukon Denali as soon as he and Nanez got the business up and running.

After the meeting at the Longhorn ended, Nanez and Neal returned to their hotel room. There they met Avila, who had transported the cocaine, but he was short one kilogram. Nevertheless, Nanez contacted Benavides and Burchwell to proceed with the deal. Nanez explained the shortage

and promised to deliver the additional kilogram to Nashville three days later. The group proceeded to an apartment with a garage so the cocaine could be extracted from the gas tank. The group traveled to the apartment in separate cars. Avila drove Neal in the car that contained the drugs, and Benavides and Burchwell drove Nanez.

In the car, Benavides, Burchwell, and Nanez discussed future cocaine deals. Burchwell knew that he had to get Nanez to agree to a sale of at least five kilograms of cocaine because he had asked AUSA Sonny Koshy over his wire what was needed for a conviction. In response to Burchwell's "tell me what Sonny needs," Koshy had advised Burchwell that it did not matter whether the sale was for five or ten kilograms. Nevertheless, Burchwell got Nanez to commit to a ten-kilogram, $180,000 sale. The sale was to take place the following Thursday in Houston with Benavides and Burchwell picking up the drugs. Upon arriving at the apartment, Nanez told Neal about the deal he had made. At that time, Neal held himself out as Nanez's "fifty-fifty partner" in the drug trade.

Avila fished the cocaine out of his gas tank, and Burchwell cut open the food-saver bags to test it and learned that gasoline had soaked through the sealed package. Despite the gas saturation, the deal went forward. Benavides and Burchwell paid $42,000, $21,000 for each of the two kilograms supplied. Nanez counted the money, and Neal recounted it after Nanez thought Benavides and Burchwell had overpaid. Once the transaction was complete, Burchwell signaled for the arrests of Nanez, Neal, and Avila.

Nanez and Neal were charged with violations of 21 U.S.C. § 841, possession of 500 or more grams of cocaine with the intent to distribute, and 21 U.S.C. § 846, conspiracy to distribute five or

more kilograms of cocaine. Nanez and Neal proceeded to trial after trying unsuccessfully to plead guilty. Both were convicted after raising entrapment defenses and claiming that AUSA Koshy had taken an inappropriate role in their investigation and arrests. They were sentenced to 240 months in prison after the sentencing court considered presentence reports and applied the United States Sentencing Guidelines ("Guidelines") and statutory minima. Nanez and Neal appeal their sentences, and Neal challenges his conviction.

## II.

To challenge his conviction, Neal claims that (A) his conspiracy conviction is supported by insufficient evidence; (B) the conspiracy conviction must be reversed because the government entrapped him; and (C) the prosecutor engaged in misconduct. Neal's challenges to his conviction are discussed *seriatim*.

## A.

In reviewing a conviction for sufficiency of the evidence, this court must determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979) (footnote omitted). In making this determination, "we do not weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001) (internal quotation and citation omitted). Rather, we view "the evidence in the light most favorable to the prosecution" and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The essential elements of drug conspiracy are: "(1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3)

-5-

participation in the conspiracy." *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999). When determining whether any rational trier of fact could have found these elements established beyond a reasonable doubt, we draw "all available inferences and resolve all issues of credibility in favor of the jury's verdict." *Salgado*, 250 F.3d at 446.

Viewing the evidence in the light most favorable to the government and giving due deference to the jury's verdict compels the conclusion that sufficient evidence supports Neal's conspiracy conviction. The record evidence permits a rational trier of fact to conclude that Neal entered into an agreement to violate the drug laws. An agreement could be inferred from Neal's description of himself as Nanez's "fifty-fifty partner" and his indication that he would purchase a Yukon Denali once he got the drug business up and running. Similarly, ample record evidence permits the conclusion that Neal knew about and had the intent to join the conspiracy. His knowledge of the conspiracy is undisputed; he knew that Nanez, Benavides, and Burchwell were discussing future drug deals at the Longhorn Steakhouse meeting, and Nanez informed him of the ten-kilogram deal he made in the car as soon as they arrived at the apartment to extract the drugs. His intent to join the conspiracy also could be inferred from the Longhorn Steakhouse meeting. Neal actively participated in that meeting, discussing drug sources and quoting drug prices for future deals. His identification of Nanez as his partner also indicates that he intended to join and, indeed, had joined the conspiracy. Finally, the record evidence supports the conclusion that Neal participated in the conspiracy. As noted, he identified sources for future drug deals and quoted prices to Benavides and Burchwell. Viewing all the record evidence in the light most favorable to the government reveals

sufficient evidence to sustain Neal's conspiracy conviction.[2]


B.

"A valid entrapment defense requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002). Predisposition to engage in the criminal activity is gauged by considering:

> 1) the character or reputation of the defendant, including any prior criminal record;
> 2) whether the suggestion of the criminal activity was initially made by the Government;
> 3) whether the defendant was engaged in the criminal activity for profit;
> 4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated government inducement or persuasion; and
> 5) the nature of the inducement or persuasion supplied by the government.

*United States v. McMahan*, No. 03-6271, 129 F. App'x 924, 931 (6th Cir. Apr. 26, 2005) (citing *Khalil*, 279 F.3d at 365). When reviewing a jury's rejection of an entrapment defense, this court can overturn the jury's verdict only if we conclude "that no reasonable juror could have concluded beyond a reasonable doubt that the defendant was predisposed to violate the narcotics laws." *United States v. Jennings*, 945 F.2d 129, 133 (6th Cir. 1991).

We cannot conclude that no reasonable juror would find Neal predisposed to participate in a drug conspiracy because the record contains strong evidence of his predisposition. He had a significant criminal history, including a felony drug charge. Rather than evidencing reluctance to

---

[2] Neal does not challenge the sufficiency of the evidence to support his conviction for possession with intent to distribute. Although the title of this portion of his brief refers to "convictions," the text only mentions the conspiracy conviction.

participate in further criminal activity, Neal escalated his participation in the business dealings among Benavides, Burchwell, and Nanez after he learned that they were engaged in a drug transaction. Neal discussed future drug deals, assured Burchwell that the transaction would be completed, identified sources, quoted drug prices, and counted drug money after learning that Nanez hired him to go on a drug-related trip. He participated in the trip for profit initially and did not disavow the profits after learning that they were criminally derived. Instead, Neal intended to participate in future drug deals for profit; he planned to use those profits to buy a luxury sports utility vehicle.

This substantial evidence of predisposition is coupled with correspondingly weak evidence of government inducement. Although the government did suggest the ten-kilogram deal, Nanez and Neal had already discussed future deals with Benavides and Burchwell at the Longhorn Steakhouse meeting. More significantly, Nanez and Benavides had negotiated installment drug deals long before Benavides began cooperating with the government. This conspiracy was not induced by the government, and the record supports an inference that this was the conspiracy that Neal joined. In light of the weak evidence of inducement and the significant evidence of predisposition, we cannot conclude that no reasonable juror could find Neal predisposed to participate in a drug conspiracy. Therefore, we uphold the jury's rejection of Neal's entrapment defense.

Neal also claims sentencing entrapment, arguing that he was predisposed to deal only in small quantities of drugs and that the government induced him to deal in larger quantities to increase his sentence. Sentencing entrapment is a legal theory that has been recognized by neither this court nor the United States Supreme Court. *See generally Sorrells v. United States*, 287 U.S. 435 (1932)

(outlining two theories of entrapment, objective and subjective, neither of which applies to sentencing); *see also Sosa v. Jones*, 389 F.3d 644, 649 (6th Cir. 2004) ("[T]he theory of 'sentencing entrapment' would have to be recognized and applied in this case. . . . [The defendant] has pointed to no Supreme Court precedent that [establishes] a federal prohibition of sentencing entrapment."); *United States v. Jones*, 102 F.3d 804, 809 (6th Cir. 1996) ("While other circuits have recognized sentencing entrapment, this circuit has never acknowledged sentencing entrapment . . . . [W]e need not address whether this circuit should adopt the defense."). We decline Neal's invitation to recognize sentencing entrapment. The record does not indicate that Neal's will was overcome or that he was inclined only to deal in small quantities. He certainly anticipated large profits, which correspond to dealing in large quantities. Thus, there is no occasion for us to consider adopting a doctrine of sentencing entrapment.

## C.

A claim of prosecutorial misconduct is reviewed for plain error when the defendant failed to object to the prosecutor's actions or statements at trial. Plain error requires a defendant to show: "(1) that an error occurred in the district court; (2) that the error was plain, *i.e.,* obvious or clear; (3) that the error affected [the] defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998) (citing *Johnson v. United States*, 520 U.S. 461, 467 (1997)). Plain error results from prosecutorial misconduct when the prosecutor makes improper comments that are so flagrant in context that they "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16 (1985). This court

has developed four factors to determine if the prosecutor's comments are so flagrant that they threaten fundamental fairness: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002) (internal quotation marks and citation omitted).

Neal's prosecutorial misconduct claim fails the plain error test; he cannot establish that prosecutorial misconduct caused a clear and obvious error in his trial. Neal cannot even establish prosecutorial misconduct, as he fails to demonstrate impropriety by AUSA Sunny Koshy. Neal claims that Koshy, by trying a case he helped investigate, impermissibly vouched for the case and witnesses against Neal. Impermissible vouching occurs when the prosecutor evidences his personal belief in any witness's credibility or implies personal knowledge of material facts unknown to the jury. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). Koshy did not imply that he had personal knowledge of the facts beyond the jury's reach, and he did not express a personal belief in any witness's credibility. Contrary to Neal's argument, a prosecutor does not commit misconduct by coordinating with police during a criminal investigation and then taking the case to trial. Because Neal cannot demonstrate improper conduct by Koshy, we reject his prosecutorial misconduct claim without further application of the plain error test.

III.

Neal and Nanez challenge their 240-month sentences. They formulated their challenges before the United States Supreme Court rendered its decision in *United States v. Booker*, 543 U.S.

-10-

220, 125 S. Ct. 738, 756 (2005) (holding that fact-finding by judges, who were sentencing defendants by mandatory application of the Guidelines, violates the Sixth Amendment). Nevertheless, their sentences must comport with *Booker's* holdings because their appeals were pending when the case was decided. *Id.* at 769 ("[W]e must apply today's holdings—both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act—to all cases on direct review.").

We review their sentences for plain error, however, because neither Neal nor Nanez raised express Sixth Amendment challenges before the sentencing judge.[3] *United States v. Oliver*, 397 F.3d

---

[3] Before the sentencing judge, Neal and Nanez challenged various sentencing enhancements recommended by their Presentence Reports. They challenged the application of the sentencing enhancements in light of the evidence.

Neither Neal nor Nanez made an explicit Sixth Amendment objection. Neal made no constitutional argument against the sentencing enhancements recommended by his Presentence Report. Therefore, he forfeited his *Booker* claim. *See United States v. Olano*, 507 U.S. 725, 731 (1993) (holding that failure to identify errors before the district court forfeits claims based upon those errors). Nanez, however, made a passing reference to "the rights under" a United States Supreme Court case. Whether this reference preserved Nanez's Sixth Amendment claim is a close question. *Compare United States v. Davis*, 397 F.3d 340, 350 (6th Cir. 2005) (finding that the defendant forfeited his *Booker* claim "[a]lthough [he] vehemently objected to the amount of loss before the district court[] [because] he failed to do so on Sixth Amendment grounds"), *and United States v. Strayhorn*, 250 F.3d 462, 467 (6th Cir. 2001) (finding that the defendant preserved his *Apprendi* claim by repeatedly objecting to the drug quantity determination and the calculation of his base offense level), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002).

Fortunately, this is a close question which this case does not compel us to resolve. Whether Nanez preserved his Sixth Amendment claim only determines whether we review his sentence de novo or for plain error. *See United States v. Oliver*, 397 F.3d 369, 377 (6th Cir. 2005) (reviewing sentence for plain error after concluding that *Booker* claim was forfeited); *Strayhorn*, 250 F.3d at 467 (reviewing sentence de novo after concluding that *Apprendi* claim was preserved). The standard under which we review Nanez's sentence is not outcome-determinative because Nanez's sentence must be vacated even under the more stringent plain error review. *See United States v. McDaniel*, 398 F.3d 540, 547 (6th Cir. 2005) ("We need not resolve this issue in this case, however, because we conclude that, even under plain-error review, we must vacate [the sentences]."). Therefore, we

-11-

369, 375 (6th Cir. 2005). We find plain error whenever judge-found facts support a mandatory Guidelines sentence longer than that supported by the jury verdict and the defendant's admissions. *See Oliver*, 397 F.3d at 380-81 ("We therefore conclude that the district court plainly erred by applying the federal sentencing guidelines as mandatory rather than advisory and thereby sentencing Oliver beyond the sentencing range which the jury verdict and Oliver's criminal history supported."); *see also United States v. Davis*, 430 F.3d 345, 361 (6th Cir. 2005) ("[The defendants'] sentences were increased based upon facts not found by the jury . . . . Such a use of judge-found facts to impose sentence enhancements under the then-mandatory United States Sentencing Guidelines is in direct contravention of the Supreme Court's holding in *Booker*. We found this type of error to satisfy the plain-error standard . . . ." (citations omitted)).

We find plain error in Nanez's sentence because the sentencing judge found facts not proven to the jury and relied on those facts to enhance Nanez's sentence under the mandatory Guidelines. Specifically, the sentencing judge found a drug quantity of fifteen kilograms and that Nanez led the drug conspiracy. The sentencing judge used those facts to enhance Nanez's sentence beyond the ten-year mandatory minimum justified by his conviction alone. Because Nanez's sentence violates the Sixth Amendment and contravenes the holdings in *Booker*, his sentence must be vacated and his case remanded for resentencing.

Neal, however, will not be resentenced; we affirm his sentence because it is unaffected by the holding in *Booker*. *See generally* 125 S.Ct. at 756. Neal was not sentenced by mandatory application of the Guidelines. Instead, Neal was sentenced to the mandatory minimum imposed by

need not determine whether Nanez's sentencing objections preserved his Sixth Amendment claim.

21 U.S.C. § 841(b)(1)(A), which was enhanced by statute because of his prior felony drug conviction. Because the Guidelines played no role in Neal's sentence, we have no ground for vacating it.

III.

For the foregoing reasons, we **AFFIRM** Neal's conspiracy conviction and his sentence. Nanez's sentence, however, we **VACATE** and **REMAND** his case to the district court for resentencing in accordance with the principles of the Sixth Amendment and *Booker*.