NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0424n.06
Filed: June 20, 2007

No. 05-4610

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| SHAWN R. SUMMERS, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellant | ) | |

BEFORE:     KEITH, BATCHELDER, and MOORE, Circuit Judges.

**DAMON J. KEITH, Circuit Judge**.    Defendant-Appellant Shawn R. Summers ("Summers") was charged and convicted by a jury for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2) . On appeal, Summers argues that the district court erred by not providing the jury with instructions for an entrapment defense. For the following reasons, we **AFFIRM** the district court's decision.

**I.**

In 1999, Summers was convicted of involuntary manslaughter and sentenced to six-years imprisonment. In September 2004, Summers was released under the parole supervision of Kevin Whaley ("Whaley"), a parole officer for the state of Ohio. Prior to Summers's release, officers within the parole authority were concerned about monitoring the future activities of Summers since some evidence had developed regarding his involvement in a threat situation involving a jail

employee. Upon his release, Whaley gave Summers the business card of Gary Hughes ("Hughes")
for the purposes of obtaining possible employment, one of Summers's parole requirements.

Hughes operated a subcontracting business. However, unknown to Summers, Hughes was
also a paroled felon working as a confidential informant for the Bureau of Alcohol Tobacco and
Firearms ("ATF") in the investigation of narcotics and firearm sales in Columbus, Ohio. In that
capacity, Hughes worked with Special Agent Daniel Ozbolt ("Ozbolt"), an undercover agent, who
used Hughes to meet people interested in purchasing drugs and guns. Whaley also supervised
Hughes, and was aware of his role as a confidential informant in the ATF investigation. While there
was a possibility of a legitimate work relationship between Hughes and Summers, it was Whaley's
intent to supervise Summers through the cooperation of Hughes.

After gaining employment with Hughes, Summers eventually quit because Hughes had not
paid him for completed work. Around this time, Summers told Hughes that he wanted to acquire
a snow plow. Hughes later set up an arrangement where Summers would receive a snow plow from
Ozbolt in exchange for firearms.[1] On March 14, 2005, Summers and Ozbolt met to make the
exchange at an undercover residence. Hughes was also present. Summers indicated that the firearm
was in his vehicle. When Summers went to retrieve the firearm from his vehicle, Ozbolt activated
hidden video equipment in the residence to tape the exchange. Summers returned with a New
England Arms, 20-gauge shotgun, along with $100 cash to trade for the snow plow. During the
exchange, Summers spoke about future gun transactions, and how he had shown Hughes some

---

[1] The record is unclear as to who initiated the negotiation or whose idea it was to trade the
snow plow for a firearm.

German pistols (Lugers) in the past. Summers also talked about SKS (cheap rifles) and Davis Industry pistols, and how he previously "unloaded" and "got rid" of some other firearms. When Summers asked where Ozbolt obtained the snow plow, Ozbolt indicated that the snow plow was stolen. After this discussion, Summers, Ozbolt, and Hughes proceeded outside and transfered the snow plow to Summers's vehicle.

On March 31, 2005, Summers was indicted and charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). Summers was subsequently arrested. On May 23, 2005, the trial began. After both sides presented their cases, the defense requested an entrapment jury instruction. After some consideration, the district court denied the request, finding that Summers had failed to present sufficient evidence that would permit a jury to reasonably find that he was entrapped. On May 24, 2005, the jury returned a verdict finding Summers guilty, and on September 22, 2005, the district court sentenced Summers to 63 months imprisonment. On November 11, 2005, Summers filed a timely notice of appeal.

**II**

"We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). "A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Id.* Moreover, "the defendant is entitled to an entrapment instruction 'whenever there is sufficient evidence from which a reasonable jury could

find entrapment.'" *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (quoting *Mathews v. United States*, 485 U.S. 58, 62, (1988)).

"A valid entrapment defense requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity. To be entitled to an entrapment instruction, the defendant must come forward with evidence to support both elements of the defense." *Id*. (internal citations omitted). Our "central inquiry in entrapment cases is whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so." *United States v. Pennell*, 737 F.2d 521, 534 (6th Cir. 1984). Government agents do not entrap by merely presenting the opportunity to engage in criminal activity. *See United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990).

Here, because Summers has failed to present sufficient evidence from which a reasonable jury could find entrapment, the district court did not improperly deny his request. In particular, Summers presented insufficient evidence to prove his lack of predisposition to engage in criminal activity.[2] At trial, the Government produced a videotape recording of the exchange between Summers and Ozbolt, the undercover agent. The recording, coupled with the testimony of Ozbolt, established that Summers possessed a firearm (a 20-gauge shotgun) and traded it for a snow plow.

---

[2] In determining predisposition, this Court has considered several factors relevant: (1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the Government. *See Khalil*, 279 F.3d at 365.

The recording also showed Summers discussing the trafficking of firearms and the possibility of future transactions. On tape, Summers also admitted showing Hughes, the confidential informant, firearms (German Lugers) in the past, and that he previously "unloaded" and "got rid" of some firearms. In reviewing this evidence, the district court concluded that "there [was] [in]sufficient evidence which a jury could reasonably find that defendant was not predisposed to committing the offense of possession of a firearm by a convicted felon[.]" (J.A. at 369).

On appeal, Summers presents no evidence warranting the reversal of the district court's decision. It is undisputed that Summers had a criminal record as he was previously convicted of involuntary manslaughter. *See Khalil*, 279 F.3d at 365 (noting that a defendant's criminal history is relevant when determining predisposition). Furthermore, even though the record does not clearly establish who suggested the gun transaction, Summers's own statements show that he engaged in gun trafficking before, as well as his willingness to do so in the future. Likewise, Summers provides no evidence of his reluctance to trade the firearm for the snow plow, nor does he proffer any evidence that the transaction resulted only after repeated Government inducement or persuasion. Even if we were to accept Summers's proposition that Hughes, the Government's confidential informant, induced him by arranging the transaction, merely presenting Summers with an opportunity to traffic guns he admitted possessing does not constitute entrapment. *See Nelson*, 922 F.2d at 317.

The record, therefore, shows that Summers was predisposed—"an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Khalil*, 279 F.3d at 365. Accordingly, "[w]here the evidence 'clearly and unequivocally establishes that [the defendant] was

predisposed,' the district court is justified in denying an entrapment instruction." *Id.* (quoting

*Nelson*, 922 F.2d at 317) (second alternation in original). Having found predisposition, we see no

need to address whether Summers presented sufficient evidence to support government inducement,

the first element of the entrapment defense.

### III

For the aforementioned reasons, we **AFFIRM** the district court's refusal to issue entrapment

instructions to the jury.