**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0667n.06

**No. 13-2299**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 27, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| ZAYD ALLEBBAN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: MOORE, SUTTON, and ALARCÓN[*], Circuit Judges.

ALARCÓN, Circuit Judge. Zayd Allebban appeals his conviction and sentence on two counts of obstructing justice for assisting his friends and business associates Philip Shisha and Tahir Kazmi to create receipts to make it look like Kazmi had repaid several large bribery or extortion[1] payments Shisha made to him.

Allebban argues that we should reverse his conviction because the district court abused its discretion by declining to give his proposed entrapment instruction. He also contends it erred in allowing Kazmi to invoke his Fifth Amendment right not to testify, permitting the Government not

---

[*] The Honorable Arthur L. Alarcon, Senior Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

[1] As the Government noted at trial and the district court acknowledged, "It's not clear whether it was bribes or extortion based on the record in this case."

to immunize Kazmi's testimony so that he could testify, and sentencing him as an accessory to a bribery offense instead of a gratuity offense. We disagree with each of these contentions and affirm.

I

A

Viewing the evidence in the light most favorable to the Government as the prevailing party, we summarize the facts as follows:

Tahir Kazmi began working for Wayne County, Michigan, in 2006. He became its Chief Information Officer (CIO) in 2008. As CIO, Kazmi was the head of the Wayne County Department of Technology.

Zayd Allebban began working for the County in 2007 and joined the Department of Technology with Kazmi in 2008. Kazmi brought Allebban to that department with him when he became CIO and ultimately promoted Allebban to Director of Enterprise Applications.

In their respective roles in the County's Department of Technology, Kazmi and Allebban were directly involved in developing the requests for proposals that would lead to contracts with the County. Strategic Business Partners, owned by Philip Shisha, was a Detroit-area technology company that specialized in records management and software customization. Starting in 2008, Strategic Business Partners received several contracts with Wayne County through the Department

of Technology, culminating in a multimillion dollar "eGovernment" contract the Department awarded in July 2009.

Kazmi introduced Allebban to Philip Shisha in 2008.

1

FBI agents Kyle Albert and Robert Beeckman testified that the FBI began investigating corruption, including bribery and extortion, in Wayne County government offices in September 2011. Kazmi was one of the early subjects of the investigation. As the investigation unfolded, the FBI also directed its attention to Shisha and Strategic Business Partners.

Agents Albert and Beeckman testified that in investigating Wayne County government officials and its vendors, the FBI was particularly interested in the exchange of money or other items of value between individuals, regardless of how the parties involved in the exchanges may have characterized those transactions, whether as bribes, extortion, gifts, or loans. Agent Albert testified that the news coverage surrounding its investigation was "pretty frequent" and occasionally mentioned Strategic Business Partners and Shisha specifically.

Agent Beeckman testified that Kazmi met with FBI officers under the terms of a proffer agreement on November 29, 2011, and again on December 6, 2011. When the FBI agents asked Kazmi whether Shisha had given him any money, Kazmi responded that he and Shisha had gone on a fishing trip, but that they each had paid their own way.

Shisha testified as a witness for the prosecution. He testified that Kazmi began asking him for money in May 2009. He testified that between 2009 and 2011, Kazmi asked for, and Shisha provided, several cash payments ranging between $8,000 and $17,000. Shisha also testified that he paid the expenses for Kazmi (and sometimes his family) to travel to various locations (including Atlanta, Orlando, Turkey, and Hawaii). At Kazmi's insistence, Shisha also bought Kazmi a digital camera and cell phones for his children. Shisha further testified that Kazmi was "humiliating, intimidating and abusive" to him in business meetings.

Shisha testified that shortly after Kazmi's December 6, 2011 meeting with the FBI, Kazmi met with Shisha and Kazmi's nephew at a movie theater in the Great Lakes Crossing Mall in Auburn Hills, Michigan. During the meeting, Kazmi suggested that Shisha issue a receipt to serve as evidence that Kazmi had paid him back for the trips and goods Shisha had paid for by credit card. Shisha testified, however, that Kazmi had not paid any amount at the time he originally asked for Shisha to issue a receipt.

On December 9, 2011, the FBI attempted to contact Shisha; Shisha promptly responded with his attorney and arranged a meeting for January 18, 2012.

Shisha testified that Allebban called him to arrange a meeting on December 11, 2011. He testified that Allebban stated at this meeting that he had heard the FBI was looking for Shisha and asked whether Shisha had spoken with the FBI. Shisha testified that Allebban told him, "If somebody asks you if you have given any gifts, you need to say no."

At his January 18, 2012 meeting with the FBI, Shisha informed them that he had made payments to Kazmi. Shisha also informed the FBI that Kazmi had tried to persuade Shisha not to disclose his and Shisha's financial relationship to them.

On January 19, 2012, the FBI wired Shisha with a recording device and asked him to arrange a meeting with Allebban. Due to a technical error, the meeting was not recorded. Shisha testified that he told Allebban at the January 19, 2002 meeting that he was concerned because his attorney had asked for information regarding payments Shisha had made to Kazmi. Shisha testified that when he asked Allebban what he should do, Allebban advised Shisha not to talk to his attorney and to "[w]ait until I get back with you after I talk to Tahir, to Mr. Kazmi."

Shisha and Allebban met again on January 20, 2012. Kazmi was present as well. Shisha testified that just before this meeting, he met with the FBI to be outfitted with a wire and to discuss what he would say. Before Kazmi arrived, Allebban showed Shisha a text message from Kazmi asking whether Shisha was wired. After Shisha denied that he was wired, they went to Allebban's car, where Kazmi met them. (Shisha was, in fact, wearing a wire, and the January 20, 2012 conversation was recorded.)

The recording transcript for that date reveals that the parties discussed the money Shisha had paid Kazmi over the past couple of years. Regarding a trip to Turkey, Kazmi insisted that he had paid Shisha back in installments. Shisha reminded Kazmi, "You told me in the theater [in early December], I'll write a receipt." Allebban stated that "what he needs to give you in order for things

to be square. . . . So that you can with a clear conscience honestly tell your attorney or even the feds or whoever that you haven't given him anything."

The transcripts also reflect that during the January 20, 2012 meeting, Allebban continued to suggest that if Kazmi paid back everything Shisha had given Kazmi, there could be no wrongdoing. Allebban stated that "there's a difference between a gift and a loan" and that if Kazmi returned the money to Shisha, Shisha could tell the FBI, "with a clear conscience," that Shisha and Kazmi did not exchange money. The recording reveals that the three agreed that Kazmi would first pay back the amount of the charges Shisha had put on his credit card so that he would be able to say, if and when he was questioned, that those funds had been repaid. Allebban responded that Kazmi and Shisha could trust each other, and that there was no harm in what they were doing as long as they were honest about the repayments.

On January 22, 2012, Allebban met Shisha in a parking lot to give him $14,000 in cash from Kazmi. This meeting was also recorded. The transcript discloses that Allebban and Shisha expressed concern about their situation. Allebban commented, "I hate doing any of this. It makes me uncomfortable." Shisha told Allebban he was worried about what the FBI would deduce from the cash withdraw and exchange, but reassured Allebban that he knew Allebban " had nothing to do with it."

Allebban and Shisha met at a FedEx store on January 26, 2012, to use a computer to create receipts to document that Shisha had been repaid by Kazmi. Allebban wrote out five receipts for

transactions between Kazmi and Shisha spanning over three years.  The receipts provided that Kazmi had repaid Shisha approximately two weeks after he had loaned money to Kazmi.  Shisha signed the receipts, and Allebban agreed to deliver them to Kazmi so he could sign them as well.  Shisha testified at trial, however, that the representations in the receipts were false—that he had not been paid back in two weeks.

Allebban and Shisha met again on January 31, 2012.  This meeting was also recorded.  The transcript indicates that Allebban expressed discomfort with the five receipts they had created at FedEx.  He commented, "[I]t's awkward, you know, five different receipts."  The transcripts also disclose that Allebban convinced Shisha to sign the single receipt and delivered to him an additional $10,000 in cash from Kazmi.

Allebban stated that the receipt was necessary "so that you can say there were no gifts, or you didn't give anything, or whatever.  That's the purpose."  The receipt states "that any costs [Shisha had] absorbed as a result of any business, personal or other transaction (including any costs resulting from travel, conference, product demonstrations, out-of-state meetings, etc) for [Kazmi] have been repaid in full with no outstanding balance."  Allebban informed Shisha at the meeting, however, that Kazmi still had not repaid all of the money: "[Y]ou need to be able to say, yanni, with a clear conscience, man, that [Kazmi] paid you back, even if that means, more cash needs to come. *Which it does*."

Allebban met with Shisha for the last time on February 2, 2012. This meeting was also recorded. The two discussed what answers Shisha should give when questioned by his attorney or by the FBI. Allebban suggested that Shisha not say anything to his attorney about the payments he had made to Kazmi, because if he did, his attorney might want to tell the authorities about the payments. Allebban also suggested that Shisha hold onto the receipt and use it only if the authorities asked about the payments. Shisha stressed that he was nervous and scared about everything that was going on, and Allebban reassured him that they had done nothing wrong: "What did you guys do illegal? If you guys did something illegal, I wouldn't be here then."

2

Allebban testified at his trial that "[t]he possibility that there was any impropriety didn't even enter my mind," because he "knew these guys. . . . Tahir is an honest guy but he's very aggressive in the way he works. Phil is an honest guy but he's very—he's soft spoken and he's more on the gentle side." Allebban also testified that had he known that Kazmi "was receiving bribes or extortion or whatever the case may be, anything illegal or unethical, I absolutely would not have been involved."

Regarding the publicity surrounding the FBI's investigation, Allebban testified that he was aware of the news reports and welcomed the investigation because, while he had not personally witnessed corruption, he had seen hints of it "here and there." He also testified that he was present when the FBI served a subpoena on Kazmi in the Wayne County office.

Allebban testified that the first time he learned that Shisha had given money to Kazmi was during his January 19, 2012 meeting with Shisha. He stated that he was shocked when Shisha told him at that meeting that he had paid Kazmi between $80,000 and $90,000. Allebban testified that even after hearing this, he still did not suspect any impropriety.

Allebban testified that Shisha stated during the January 19, 2012 meeting that his father was ill with kidney problems and that Shisha seemed "very stressed" and "very worried" during this meeting. He testified that Shisha told him that "he felt like he couldn't handle it and he mentioned killing himself. . . . [I]t was very clear that he had considered the possibility of ending his life. That wasn't—that's without a doubt." Allebban testified that he took this statement as a sign of Shisha's panic and fear and did not believe Shisha to be kidding.

Allebban testified that the dates he put on the five receipts that he drafted at the FedEx store on January 26, 2012, were based on Kazmi's "word that he had repaid within two to three weeks of each loan." Allebban testified that after the January 26 meeting, he met separately with Kazmi and expressed his uneasiness about the five receipts. Allebban testified that during this meeting, Kazmi suggested that they should prepare a single receipt instead.

Allebban testified that because he was uncomfortable with the five receipts he created at FedEx, he did not get Kazmi's signature on those receipts and instead threw them away. In their place, he and Kazmi decided to create the single receipt dated August 16, 2011.

B

1

On February 15, 2012, the Government filed a criminal complaint against Kazmi and Allebban, charging Allebban with obstruction of justice in violation of 18 U.S.C. § 1512(c) and Kazmi with obstruction of justice, federal program fraud (bribery), and extortion in violation of 18 U.S.C. §§ 1512(c), 666(a)(1)(B), and 1951, respectively.

On July 26, 2012, Kazmi entered into a Rule 11 plea agreement with the Government. Kazmi agreed to plead guilty to the bribery charge and cooperate with the Government in exchange for the dismissal of the other two charges.

On August 1, 2012, a grand jury returned a second superseding indictment ("indictment") charging Allebban with conspiracy to obstruct a federal investigation in violation of 18 U.S.C. § 1512(k) (count one) and three counts of obstruction of justice by means of false documents, in violation of 18 U.S.C. § 1519 (counts two through four). The first obstruction count related to the five receipts Allebban created at FedEx, while the remaining counts related to the single receipt—one count for Shisha's signature, and one count for Kazmi's. Specifically, the indictment alleged that Allebban had

> sought to persuade [Shisha] to provide false information to the Grand Jury and FBI investigation, including:

1.	(1) that [Shisha] had not given anything to Kazmi and that Kazmi had long ago repaid [Shisha] for the trips and money [Shisha] had provided to Kazmi since 2009, and

2.	(2) that [Shisha]'s cash withdrawals of money had been used for gambling or other personal activities by [Shisha], and not to make cash payments to Kazmi.

The indictment set forth the meetings described above, including the payments Allebban delivered to Shisha on Kazmi's behalf, and alleged that the creation of the receipts "falsely stated that [Shisha] had been repaid by Kazmi as of August 16, 2011."

2

Before trial, Allebban subpoenaed Kazmi to testify as a witness for the defense regarding the factual basis for Allebban's actions and to disprove the existence of an agreement between Allebban and Kazmi for purposes of the conspiracy charges against Allebban. In support of the subpoena, Allebban's counsel argued that Kazmi could, "if he testifies truthfully[, ]provide the factual basis for Mr. Alleben's [*sic*] actions and state whether an agreement actually existed or not."

Kazmi moved to quash Allebban's subpoena. At the time of Allebban's trial, Kazmi had already pleaded guilty to soliciting bribes under 18 U.S.C. § 666(a)(1)(B) and was awaiting sentencing. After receiving two days of testimony, and hearing argument on the issue, the district court concluded that Kazmi had a legitimate fear of self-incrimination based on the fact that he had not yet been sentenced, since "he could say something that would expose him to a higher sentence or a level adjustment under the guidelines." The court also noted that, "given the fact that there's

an ongoing investigation," Kazmi's testimony at Allebban's trial "may expose him to some reasonable fear of prosecution in other cases that the government has going on, including tax and other cases."

3

Allebban's primary defense at trial was that he lacked the intent to obstruct justice because he believed that the payments from Shisha to Kazmi were merely loans—not a quid pro quo—and thus he did not believe the documentation repayment of that money would obstruct or impede the FBI's investigation. The jury did not believe this defense.

Allebban also asserted that he was entitled to an acquittal based on the defense of entrapment. He requested the court to instruct the jury that the FBI, through Shisha, had entrapped him, based on Shisha's emotional pleas regarding the need to create the receipts to demonstrate he did not commit bribery or extortion. The district court denied Allebban's request for an entrapment instruction.

The district court instructed the jury that it must find that Allebban knowingly made a false entry in a document, or aided another in doing so, "with the intent to impede, obstruct or influence the investigation or proper administration of a matter within the jurisdiction of a department or agency of the United States." The court also instructed the jury that Allebban's theory of the case was that he "had no intention of interfering or obstructing a government—interfering with or

obstructing a government investigation and that he never agreed with anyone to obstruct the investigation."

On February 19, 2012, the jury returned its verdict acquitting Allebban of the criminal conspiracy and the obstruction charge related to the five receipts he produced at FedEx on January 26, 2012. The jury found Allebban guilty as charged in counts three and four for obstruction of justice related to the single receipt dated August 16, 2011.

II

The district court sentenced Allebban to 41 months imprisonment, at the high end of the United States Sentencing Guideline range for Allebban's role as an accessory after the fact to Kazmi's bribery solicitations. In doing so, the court applied a two-level enhancement based on the court's determination that Allebban knew or should have known that the underlying offense involved more than one bribe or act of extortion. The court also applied a six-level enhancement to reflect the fact that the bribes amounted to more than $30,000 but less than $70,000.

The district court entered its judgment of conviction on September 16, 2012. This timely appeal followed.

III

Allebban contends that the district court abused its discretion or committed error by failing to instruct the jury on his proposed entrapment instruction. This Court reviews jury instructions "as

a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Poulsen*, 655 F.3d 492, 501 (6th Cir. 2011). A district court abuses its discretion when it refuses to give an instruction that "is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Id.* at 502 & n.1 (quoting *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)).

"The defense of entrapment has two elements: (1) government inducement of the crime, and (2) the defendant's lack of predisposition to engage in the criminal activity." *Id.* at 502. Whether a defendant has been entrapped generally is a question for the jury, not the court. *Mathews v. United States*, 485 U.S. 58, 63 (1988). "In cases where the evidence bearing on the question of entrapment is in dispute, the defense of entrapment must be submitted to the jury." *United States v. Hodge*, 539 F.2d 898, 906 (6th Cir. 1976).

As a preliminary matter, Allebban contends he need only have presented "some evidence" tending to establish the Government's inducement and Allebban's lack of predisposition and that he was entitled to an entrapment instruction "[e]ven when the supporting evidence is weak or of doubtful credibility." Appellant's Br. 27–28 (citing *United States v. Garner*, 529 F.2d 962, 970 (6th Cir. 1976)). The case Allebban cites for this proposition, *United States v. Garner*, 529 F.2d 962, states more fully, "[W]hen a *theory of defense* finds some support in the evidence and in the law, a defendant is entitled to some mention of that theory in the instructions. Even when the supporting

evidence is weak or of doubtful credibility its presence requires an instruction on *the theory of the defense*." *Id.* at 970 (emphasis added) (citation omitted).

The district court instructed the jury that it should consider whether Allebban lacked the intent to obstruct an FBI investigation.[2] This is different from Allebban's proposed entrapment defense, which goes to the legal issue whether the Government entrapped Allebban. This circuit recently distinguished *Garner*'s "some evidence" standard, which applies to a defendant's request for the district court to instruct the jury on the defendant's theory of the case, from the more stringent standard for instructing a jury on a legal issue, such as whether the defendant was entrapped. *United States v. Demmler*, 655 F.3d 451, 456 n.1 (6th Cir. 2011). In *Demmler*, this Court explained that "the court only instructs the jury on a legal issue when the jury has before it *sufficient evidence* from which to make a finding about that issue, *i.e.*, when it has facts to which it can apply the law about which it is instructed." *Id.* (emphasis added) (citing *Mathews*, 485 U.S. at 63–64; *Khalil*, 279 F.3d at 364–65). The Supreme Court has similarly held that a defendant may be "entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews*, 485 U.S. at 62. Thus, this circuit and the Supreme Court have made clear that Allebban would have been entitled to an entrapment instruction only if he had produced *sufficient evidence* from which a reasonable jury could find *both* government inducement and the defendant's lack of predisposition. *Poulsen*, 655 F.3d at 502;

---

[2]The court instructed the jury that Allebban's theory of the case was that he "had no intention of interfering or obstructing a government – interfering with or obstructing a government investigation and that he never agreed with anyone to obstruct the investigation."

*Demmler*, 655 F.3d at 456–57.  The law of this circuit therefore does not support Allebban's argument for a relaxed "some evidence" evidentiary burden for his proposed entrapment defense.

On the merits, an entrapment inquiry typically centers on whether the defendant was predisposed to commit the crime.  *Poulsen*, 655 F.3d at 503.  A "predisposed defendant is one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense." *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990) (internal quotation marks omitted).

Factors relevant to a defendant's predisposition include (but are not limited to) (1) the defendant's character or reputation, "including any prior criminal record"; (2) whether the government initially suggested the criminal activity; (3) "whether the defendant was engaged in the criminal activity for profit"; (4) "whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion"; and (5) the nature of the government's inducement or persuasion. *United States v. Khalil*, 279 F.3d 358, 365 (6th Cir. 2002). A trial court is justified in denying an entrapment instruction only "[w]here the evidence clearly and unequivocally establishes that the defendant was predisposed" to commit the crime. *Id.* (alteration and internal quotation marks omitted).

Allebban contends the record shows that Shisha initially suggested that Allebban create allegedly false receipts to show that Kazmi had repaid the alleged loans.  The undisputed evidence credited by the jury shows that Kazmi—not Shisha—was the first to raise the idea of writing a

receipt and that Allebban was aware of this fact. The recording transcript reflects that the first mention of a receipt in Allebban's presence was Shisha's unambiguous reference to Kazmi's earlier suggestion that he could create a receipt to evidence repayment of the money:

> Shisha:        You told me in the theater, I'll write a receipt.
> Kazmi:        Write a receipt right, okay. So, so how much is that?

Shisha testified that "for the record, it was not my idea [to create a receipt]. It started when Mr. Kazmi met me in the theater about getting receipts. I just want you to know. . . . His idea was to create these receipts." Allebban himself testified that the idea to create receipts was "probably just the conversation that ensued" when Shisha mentioned that he needed a way to evidence that the money had been repaid. Thus, Allebban's own testimony reveals that the idea to create receipts evolved as part of a group discussion and was not suggested by Shisha.

The transcripts of the recorded conversations further reveal that at the meeting with Allebban and Kazmi on January 20, 2012, Shisha simply asked Kazmi what he should do about the situation, and that Allebban suggested that Shisha "need[ed] to tell [Kazmi] what he needs to give you in order for things to be square. . . . So that you can with a clear conscience honestly tell your attorney or even the feds or whoever that you haven't given him anything." Thus, the evidence demonstrates that Allebban knew it was Kazmi's original idea to create receipts and that Allebban told Shisha that if Kazmi would sign a receipt that would demonstrate that Shisha had not bribed Kazmi to obtain a Wayne County contract.

Before this Court, Allebban contends the evidence was sufficient to persuade the jury that Shisha convinced him to obstruct justice through repeated inducement, persuasion, and threats of suicide. He points specifically to the fact that he "wasn't comfortable" with the receipts he created at FedEx on January 26, 2012, and subsequently threw those receipts away.

This argument is unpersuasive because it ignores the context of Allebban's alleged discomfort. The transcript from his and Shisha's meeting—arguably the more reliable source for its contemporaneous proximity to the events—reveals that he was only uncomfortable with the five receipts because it was awkward, and thus less believable, to have five separate receipts instead of a single receipt: "I think this is, I, I, I thought about it, I didn't like it, man. . . . Yanni it's just, ah, it's just not, ah, it's awkward, you know, five different receipts." His recorded statements at the meeting do not suggest that he was uncomfortable with the underlying idea to create a single receipt.

The crimes alleged against Allebban were his participation in facilitating Kazmi's repayment of the money Shisha gave Kazmi and documenting that repayment. The entire thrust of Allebban's defense at trial was that he honestly believed throughout the relevant period that the payments Shisha made to Kazmi were loans and that he had no idea anything illegal had been going on. Unfortunately for Allebban, the jury found that his testimony regarding his defense to the obstruction charges was not credible. Thus, in light of the jury's verdict on this key question of fact (that is, Allebban's knowledge that bribery or extortion was involved), the narrow issue remaining for this Court, then, is only whether Allebban presented sufficient evidence to persuade the jury that Shisha *induced* him into helping Kazmi obstruct justice by preparing the receipts. Allebban

testified, "[T]hey were my friends and, you know, *therefore I didn't mind helping them*" (emphasis added).

Allebban argues that the nature of the Government's inducement weighs heavily in his favor, as Shisha told Allebban that he was suicidal and that his father was ill and urinating blood. This factor goes to both the fourth *Khalil* factor for Allebban's predisposition (whether the Allebban evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion) and entrapment's inducement prong more broadly. The district court did acknowledge that Shisha "may have gone too far," and it noted that Allebban could suggest as much to the jury in closing arguments. For the purposes of entrapment, however, Allebban's testimony demonstrates that he was motivated by his concern for both Shisha *and* Kazmi, who was undisputably not a Government informant. He testified that at the January 20, 2012 meeting, "They both expressed to me concern. They were both panicked and worried about this money and the trips and how it may appear. So that's why I suggested to Tahir . . . to just meet Phil, to sit down with him, have a discussion with him and work it out. I thought that would, you know, address the problem."

Shisha testified that he "was on a mission of getting information for the investigation." He also testified, however, that he did not lie about his emotional state to aid the investigation, and that the fear he felt was genuinely based on his own fear of being prosecuted.

On balance, taking into account the five *Khalil* factors, we conclude that the testimony and evidence in this case credited by the jury clearly and unequivocally demonstrate that Allebban's willingness to help Shisha resulted, not from Shisha's emotional pleas, but from Allebban's alleged belief that physical evidence that Kazmi had repaid Shisha would absolve both parties of criminal liability. In Allebban's last meeting with Shisha on February 2, 2012, he stated, "What's the, what's illegal? Nothing. What did you guys do illegal? If you guys did something illegal, I wouldn't be here then. I wouldn't be helping." Allebban also testified that he wanted to help both Kazmi and Shisha in their difficult time because the men were his friends. Simply put, Allebban repeatedly demonstrated that he was "ready and willing to commit [the] offense [of obstructing justice] apart from government encouragement." *Nelson*, 922 F.2d at 317 (internal quotation marks omitted). This evidence clearly and unequivocally demonstrates that Allebban was not reluctant to commit the offense, and thus was not motivated solely by Government inducements.

The evidence also establishes that Allebban knew that Kazmi, who was not working for the Government, was the first to suggest the creation of receipts. This evidence clearly and unequivocally establishes that the Government did not initially suggest the only criminal activity charged.

Allebban therefore failed to introduce sufficient evidence for the jury to find that Allebban was not predisposed to obstruct justice. As a result, the district court's failure to give an entrapment instruction did not impair Allebban's defense. The district court did not abuse its discretion in refusing to instruct the jury on Allebban's proposed entrapment instruction.

IV

Allebban contends next that the district court violated his Sixth Amendment right to compulsory process by allowing Kazmi to invoke his Fifth Amendment right against self-incrimination and avoid testifying on Allebban's behalf. Allebban notes that as a part of Kazmi's plea agreement, Kazmi entered into a cooperation agreement with the Government. Under that agreement, Kazmi agreed to assist the Government in investigating and prosecuting others involved in criminal activity in exchange for the Government's promise not to use any new information Kazmi provided against him at sentencing. The agreement also obliged Kazmi to volunteer all relevant information, even if he was not asked. Thus, Allebban argues, at the time he sought to have Kazmi testify on his behalf, "Kazmi had zero reasonable fear of divulging incriminating information on the witness stand that he did not already have an obligation to disclose to the government."

The Government notes that the plea agreement referred only to the sentencing guidelines, which the sentencing court would be free to disregard. The Government also asserts that while the agreement promised to dismiss the pending charges to which Kazmi did not plead guilty, it did not prevent the Government from bringing additional charges his testimony might implicate, such as tax fraud, mail or wire fraud, or other corruption charges. In addition, the Government argues, Kazmi had a history of lying to the FBI, and so if he were forced to testify, cross examination based on his credibility could expose him to prosecution for making prior false statements to the FBI.

A defendant's Sixth Amendment right to compulsory process must yield to a witness's assertion of his or her Fifth Amendment privilege against self-incrimination "when the claimed privilege is grounded on a reasonable fear of prosecution." *United States v. Highgate*, 521 F.3d 590, 593 (6th Cir. 2008) (citing *United States v. Gaitan–Acevedo*, 148 F.3d 577, 588 (6th Cir. 1998)). The district court is "necessarily . . . accorded broad discretion" in determining the propriety of a witness's claimed Fifth Amendment privilege. *Gaitan–Acevedo*, 148 F.3d at 588 (internal quotation marks omitted). We therefore review for abuse of discretion the district court's grant or denial of a witness's asserted Fifth Amendment right against self-incrimination and will affirm the district court only where we are "left with a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Boothe*, 335 F.3d 522, 525 (6th Cir. 2003) (internal quotation marks omitted).

Ordinarily, a witness seeking to invoke the Fifth Amendment must take the stand and answer individualized questions before the district court can conclude that the invocation is proper. *United States v. Bates*, 552 F.3d 472, 475–76 (6th Cir. 2009). "This presumption against blanket assertions of Fifth Amendment privilege is premised on the common sense notion that a judge must know what the witness believes is incriminating in order to evaluate whether the witness invokes the privilege with 'reasonable cause.'" *Id.* Where the witness "has a clear entitlement to claim the privilege," however, " forcing the defendant to take the stand is 'futile' and thus unnecessary. In such a case, the reason behind the rule does not apply because the court already knows that 'reasonable cause' to invoke the privilege exists." *Id.* (citations omitted).

The district court did not abuse its discretion in permitting Kazmi to invoke his Fifth Amendment right against self-incrimination. This circuit has held that "a guilty plea is not a blanket waiver of the privilege against self-incrimination and it survives through sentencing." *Boothe*, 335 F.3d at 527; *see also Mitchell v. United States*, 526 U.S. 314, 325 (1999) ("Where a sentence has yet to be imposed, however, this Court has already rejected the proposition that incrimination is complete once guilt has been adjudicated, and we reject it again today." (internal quotation marks omitted)). Further, the court in *Boothe* expressly declined to adopt the Fifth Circuit's rule that a witness may not invoke the Fifth Amendment out of fear of a future perjury prosecution (the rationale for that rule being that the "shield against self-incrimination in such a situation is to testify truthfully"). *Boothe*, 335 F.3d at 526–27 (quoting *United States v. Whittington*, 783 F.2d 1210, 1218 (5th Cir. 1986)). The Sixth Circuit therefore implicitly recognizes the risk of prosecution, or enhancement at sentencing, for perjury as a basis for reasonable cause to invoke the Fifth Amendment privilege.

The district court here expressed particular concern over the "real problem" that Kazmi had pleaded guilty but had not been sentenced. The court noted that Kazmi "could say something that would expose him to a higher sentence or a level adjustment under the guidelines." The Government stated that it would consider Kazmi's testimony at Allebban's trial, if any, in its sentencing position at Kazmi's sentencing hearing.

The district court also noted that Kazmi's proffer agreement with the United States was not itself a grant of immunity, and noted the general rule that "[t]he privilege against self-incrimination

protects against a party forcing an individual to adopt, at trial, his unsworn out-of-court confession." (quoting *United States v. Rivas-Macias*, 537 F.3d 1271, 1281 (10th Cir. 2008) (internal quotation marks omitted)). Furthermore, while Kazmi took the stand and asserted the Fifth Amendment as to basic foundational questions, Kazmi's counsel explained to the court his belief that "any kind of relationship or acknowledgment of relationship with [Allebban], it would tend to incriminate him."

The district court clearly articulated its conclusion that Kazmi's testimony "could negatively impact him at sentence or otherwise," and potentially "expose him to some reasonable fear of prosecution in other cases that the government has going on." We therefore conclude that the district court did not abuse its discretion in accepting Kazmi's invocation of his Fifth Amendment privilege against self-incrimination.

V

Allebban further argues that the Government's refusal—at the district court's request—to grant Kazmi use immunity for his testimony violated his due process right to present a complete defense. Allebban acknowledges that, under this circuit's case law, the district court lacked the authority to grant Kazmi immunity itself. Instead, he relies on, *United States v. Quinn*, 728 F.3d 243 (3d Cir. 2013) (en banc), decided after the district court ruling in this matter, for the proposition that "[t]he *government* should have granted immunity to Kazmi, and its tactical decision to keep Kazmi's exculpatory testimony from the jury without a countervailing reason for doing so violated Allebban's due-process rights." While he does not specifically say so, Allebban's position (based

on the remedy outlined in *Quinn*) must be that the district court should have ordered the Government to retry the case or face dismissal of the relevant charges. *See Quinn*, 728 F.3d at 248 ("[T]he remedy for [the Government's] due process violation, rather than intruding into the prosecutor's province by judicial grants of immunity, is a retrial where the Government can cure the distortion caused by its wrongdoing or face dismissal of the relevant charges."); *see also United States v. Pennell*, 737 F.2d 521, 526 (6th Cir. 1984) ("The recommended remedy in [prosecutorial-misconduct] cases has been that a court not grant use immunity to defense witnesses, but rather that the court set aside the conviction and remand the case to afford the prosecutor an opportunity to immunize both government and defense witnesses under the use immunity statute.").

Allebban failed to preserve his claim that the court should have ordered a retrial. The district court ruled on Kazmi's motion to quash on February 7, 2013, and *Quinn*—Allebban's sole source of support for his position—was not decided until August 14, 2013. Thus, the district court could not have considered Allebban's current position any more than Allebban could have argued it.

Allebban argues the district court did in fact fully consider the immunity issue, evidenced by the fact that the district court directly asked the Government whether it would simply immunize Kazmi so that he could testify on Allebban's behalf. We disagree. The district court did not fully consider the issue, because Allebban never raised the arguments he asserts now before the district court. Further, while *Quinn* was unavailable to him at the time, a close analog to *Quinn* exists under the law of this circuit in the form of a narrow exception to the general rule that a district court cannot grant immunity. *See United States v. Emuegbunam*, 268 F.3d 377, 401 (6th Cir. 2001) ("No court

has authority to immunize a witness. Only two limited circumstances present possible exceptions to this rule." (citations and internal quotation marks omitted)). Under this prosecutorial-misconduct exception, "due process requires an immunity grant where the prosecution abuses its discretion by intentionally attempting to distort the fact-finding process." *United States v. Talley*, 164 F.3d 989, 998 (6th Cir. 1999) (internal quotation marks omitted). While this circuit has acknowledged that this exception exists in other jurisdictions, it has not yet adopted the exception itself. *Emuegbunam*, 268 F.3d at 401. Allebban made no attempt to argue for its application in this case.

Because Allebban did not object to the Government's refusal to grant Kazmi immunity, we review for plain error. To establish plain error, Allebban must show that the district court's plain error affected his substantial rights and seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Mack*, 729 F.3d 594, 607 (6th Cir. 2013).

To determine whether the district court's error was plain, we consider whether the error was "clear or obvious" at the time of appellate review. *Id.* Assuming the district court erred here, we conclude that the error was not obvious. Even had the district court had the benefit of *Quinn* at the time of its ruling, the district court was not clearly or obviously obliged to apply precedent that was not the law of this circuit. For purposes of the prosecutorial-misconduct exception, Allebban presented no evidence to suggest that the Government's decision not to immunize Kazmi was "made with the deliberate intention of distorting the judicial fact finding process" and that "the prosecution's sole desire is to keep exculpatory testimony from the jury." *United States v. Mohney*, 949 F.2d 1397, 1402 (6th Cir. 1991) (internal quotation marks omitted). Indeed, it was Kazmi's

counsel—not the Government—who discouraged Kazmi from testifying. And there was no evidence that the Government selectively immunized witnesses for its case while denying immunity to Allebban's key witnesses. The district court therefore did not plainly err by neither sua sponte granting Kazmi immunity nor ordering a retrial.

VI

The jury convicted Allebban on two counts of obstructing justice. The obstruction of justice guideline under United States Sentencing Guidelines, section 2J1.2, directs the sentencing judge to cross reference to the accessory-after-the-fact guideline, section 2X3.1, if doing so would result in a greater offense level than would result under section 2J1.2 without the cross reference. U.S.S.G. § 2J1.2(c)(1). Section 2X3.1 then applies the guideline for the principal's underlying offense to determine the base offense level for the accessory after the fact.

The U.S. Probation Department's Presentence Investigation Report (PSR) applied section 2J1.2(c)(1)'s cross reference and recommended that Kazmi's underlying offense for purposes of section 2X3.1 was accepting a bribe and applied Guideline section 2C1.1. The district court adopted this recommendation. The PSR then recommended a two-level enhancement under section 2C1.1(b)(1) for Kazmi's acceptance of more than one bribe.

At his sentencing hearing, Allebban argued that the enhancement should not apply because he did not know that the payments constituted bribery or extortion. The district court overruled Allebban's objection and applied the enhancement, concluding that "at the very minimum in his

heart of hearts, based on all the facts he should have known that these were illegitimate payments of extortion or bribes."

Allebban contends on appeal that the evidence at trial supported the conclusion that Kazmi committed only a gratuity offense, which warranted application of the gratuity guideline under section 2C1.2 instead of the bribery guideline under section 2C1.1.  The Government responds that Allebban failed to preserve this claim of error by failing to object to the enhancement provision in the PSR before the district court.  Specifically, the Government contends that Allebban objected at his sentencing hearing only to the PSR's recommendation that the court apply a two-level enhancement under section 2C1.1(b)(1) for more than one bribe or instance of extortion and a six-level enhancement under section 2C1.1(b)(3) for the value of the bribe being more than $30,000 but less than $70,000.

The Government is correct that Allebban failed to preserve his claim of error regarding the application of the bribery guideline under section 2C1.1 in lieu of the gratuity guideline under section 2C1.2.  Allebban succinctly argued before the district court that the sole issue was "whether or not the two-level enhancement for more than one bribe should be applied" under section 2C1.1(b)(1).  While the Government did acknowledge that Allebban's challenge to that enhancement "really goes to the cross reference as a whole," neither party argued—and thus the district court did not consider—whether the section 2C1.2 cross reference for gratuity was more appropriate than the section 2C1.1 cross reference for bribes or extortion.  Rather, the focus was on whether the two-level enhancement for two or more bribes could be applied where Allebban

maintained that he neither knew nor should have known that Shisha had paid Kazmi any bribe at all. As a result, the district court had no reason to consider the separate issue whether Shisha's payments could have been construed as gratuities for purposes of section 2C1.2. We therefore review for plain error. *Mack*, 729 F.3d at 607.

Application Note 1 to section 2X3.1 defines "underlying offense" as "the offense as to which the defendant is convicted of being an accessory"—that is, Kazmi's offense. U.S.S.G. § 2X3.1, cmt. n.1; *see United States v. Shabazz*, 263 F.3d 603, 608 (6th Cir. 2001) (application of section 2X3.1 "required the court to determine the offense level for the offense to which Shabazz was an accessory—that is, Corrado's offense—applying the base offense level for that offense plus any applicable specific offense characteristics of Corrado's offense that were known, or reasonably should have been known by Shabazz"). Kazmi pleaded guilty to soliciting or accepting bribes under 18 U.S.C. § 666(a)(1)(B). Appendix A to the Guidelines specifies that either Guideline section 2C1.1 (bribe or extortion) or section 2C1.2 (gratuity) may apply to an underlying violation of § 666(a)(1)(B).

The district court did not plainly err by applying section 2C1.1 instead of 2C1.2 based on the record before it. The Guideline commentary describes section 2C1.1 as applying "to a person who offers or gives a bribe for a corrupt purpose, such as inducing a public official to participate in a fraud or to influence such individual's official actions, or to a public official who solicits or accepts such a bribe." U.S.S.G. § 2C1.1 cmt. background. It describes section 2C1.2 as applying "to the

offering, giving, soliciting, or receiving of a gratuity to a public official *in respect to* an official act." U.S.S.G. § 2C1.2 cmt. background (emphasis added).

Allebban argues that the record lacked evidence that Shisha paid Kazmi to influence the award to SPG of any contract. At the very least, however, there *was* evidence that Kazmi solicited money from Shisha for a corrupt purpose, which negates the idea that Shisha gave the money to Kazmi gratuitously in respect to a public act. There is no dispute that Shisha paid Kazmi only after Kazmi asked him for money. Shisha further testified that Kazmi was generally abusive to him and that he acquiesced to Kazmi's requests for money because he was afraid that if he did not he would lose his contract with Wayne County. Shisha even went so far as to describe himself as a victim of Kazmi's advances, testifying that he "was extorted, . . . taken advantage of."

Allebban also argues that the Government made a concerted effort at Allebban's trial not to characterize any of the payments as bribes—indeed, "[o]ne of the government's primary means of undermining Allebban's no-intent defense was to repeatedly *insist* to the jury that it did not matter whether the payments were loans, bribes, gratuities, gifts, or anything else." The Government's dispute at trial was not, however, with the distinction between bribery versus gratuity specifically; rather, the Government made a point to distinguish only between bribes and *extortion*. Moreover, section 2C1.1 captures both bribes *and* extortion. Thus, the Government's objection to Allebban's characterization of the payments as bribes instead of extortion does not impair the Government's argument that section 2C1.1 applies instead of section 2C1.2.

In light of the evidence in the record that Kazmi asked for the money and that Shisha felt extorted and paid Kazmi for fear that he would lose his contract with the County, it would not have been "clear or obvious" to the district court that it should apply the gratuity guideline under section 2C1.2 instead of the bribery or extortion guideline under section 2C1.1. We therefore conclude that the district court did not plainly err in its application of section 2C1.1. *See Mack*, 729 F.3d at 607 ("To determine whether the second part of the [plain error] test is met, we need only consider whether the error is 'plain'—in other words, clear or obvious—at the present time of our appellate review.").

Conclusion

For the reasons set forth above, we **AFFIRM** Allebban's conviction and sentence.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** During his trial, Zayd Allebban argued two alternative defensive theories: that he lacked the requisite intent to obstruct justice and that he was entrapped into doing so by the inducement of a government agent. The district court instructed the jury on Allebban's first defense, but refused to give an instruction on entrapment. R. 70 (Feb. 14 Trial Tr. at 16) (Page ID #1588). A defendant is "entitled to an entrapment instruction 'whenever there is sufficient evidence from which a reasonable jury could find entrapment.'" *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (quoting *Mathews v. United States*, 485 U.S. 58, 62 (1988)). He must provide evidence to support the conclusion that the government induced the defendant to commit the crime and that the defendant lacked any predisposition to engage in criminal activity. *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011). Because I conclude that Allebban had presented sufficient evidence from which a jury could reasonably conclude that he was entrapped, I respectfully dissent.

First, the record contains ample evidence that Philip Shisha, an agent of the government, improperly induced Allebban to commit the crime by preying on their friendship and emotional ties. The Supreme Court has suggested that the "resort to sympathy" between friends is one form of improper inducement. *Sherman v. United States*, 356 U.S. 369, 373 (1958); *see also id.* at 384 (Frankfurter, J., concurring) ("Particularly reprehensible in the present case was the use of repeated requests to overcome petitioner's hesitancy, coupled with appeals to sympathy based on mutual experiences."); *see also United States v. McLernon*, 746 F.2d 1098, 1114 (6th Cir. 1984) (finding improper inducement, in part because the government agent "prey[ed] upon the love and loyalty of

[their] special relationship" as "blood brothers"). In the instant case, Shisha made numerous appeals to Allebban's sense of friendship in an effort to induce him to provide a false receipt: Shisha claimed to be suicidal, indicated that "[h]e was close to bankruptcy," and worried over his father's deteriorating health. R. 67 (Feb. 11 Trial Tr. at 82–84) (Page ID #1249–51); R. 68 (Feb. 12 Trial Tr. at 98–99) (Page ID #1394–95). Shisha testified that his purpose in appealing to Allebban's personal connection with him was to pressure Allebban into complying with his suggestions: "I showed to Mr. Allebban that I am worried so he could be helpful to get me the information that I needed." R. 66 (Feb. 8 Trial Tr. at 28) (Page ID #1001). This type of inducement is impermissible, and indeed the district court acknowledged that Shisha's emotional pressure "may have gone too far." R. 70 (Feb. 14 Trial Tr. at 13) (Page ID #1590). Therefore, on balance, I believe that there was sufficient evidence of inducement to support Allebban's request for an entrapment instruction.

Second, Allebban has provided sufficient evidence to demonstrate that he was not predisposed to engage in criminal activity "before his initial exposure to government agents." *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991) (internal quotation marks omitted). "Predisposition, the principal element in the defense of entrapment, focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63 (internal quotation marks and citations omitted). We have identified five factors that a court must weigh to determine whether a defendant was predisposed to commit a crime: "(1) the character or reputation of the defendant, including any prior criminal record; (2) whether the suggestion of the criminal activity was initially

made by the Government; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the inducement or persuasion supplied by the government." *Khalil*, 279 F.3d at 365. On each of these five factors, there is record evidence supporting Allebban's lack of predisposition.

First, there is ample evidence that Allebban, who has no prior criminal history, was considered by members of his community to be a "law-abiding" person who "generally intends to do the right thing." *See* R. 69 (Feb. 13 Trial Tr. at 90, 96, 113) (Page ID #1550, 1556, 1573). Second, a reasonable jury could conclude from the record that it was a government agent who initially suggested the criminal activity to Allebban. The majority opinion concludes that the record does not support Allebban on this factor because Tahir Kazmi, who was not a government agent, first raised the idea of creating a receipt to Shisha. However, the relevant question is whether a government agent initially suggested the idea of criminal activity *to the defendant*. Shisha testified at trial that, although Kazmi first raised the idea of a receipt with him, Shisha "brought it up" to Allebban by telling Allebban that Shisha needed to have something to show his attorney to explain the payments made to Kazmi. R. 67 (Feb. 11 Trial Tr. at 56) (Page ID #1223); *see also* R. 68 (Feb. 12 Trial Tr. at 121–22) (Page ID #1417–18). Third, Allebban did not directly profit from the criminal activity because it was Kazmi who was the beneficiary of Shisha's payments. *See* R. 70 (Feb. 14 Trial Tr. at 60) (Page ID #1637).

Fourth, there is some evidence that Allebban was initially reluctant to create the receipts, and that he agreed to do so only after Shisha told him several times that Shisha was stressed and suicidal and that he needed to have an explanation for the payments. Indeed, in response to one of Shisha's early requests for a receipt, Allebban stated that Shisha "shouldn't lie" to his attorney about the payments. R. 67 (Feb. 11 Trial Tr. at 67) (Page ID #1234). It was only after Shisha impressed upon Allebban that he was considering suicide that Allebban agreed to create a receipt to help him "calm down [and] get out of that crazy thinking mode about killing yourself and move on." R. 68 (Feb. 12 Trial Tr. at 128) (Page ID #1424). Finally, as I have already discussed, the nature of Shisha's inducement was "reprehensible." *Sherman*, 356 U.S. at 384 (Frankfurter, J., concurring). Repeated appeals to a friend's sense of loyalty and compassion are the types of compelling inducements that support an instruction on entrapment. *See United States v. Hodge*, 539 F.2d 898, 906 (6th Cir. 1976) ("[The defendant], by his undisputed testimony, effectively raised an entrapment defense by arguing that he had not previously dealt in drugs but was only, just this one time, responding to the plea of a friend in trouble."); *see also United States v. McGill*, 754 F.3d 452, 459 (7th Cir. 2014) ("Government exploitation of friendship can constitute improper inducement").

As the majority opinion acknowledges, "[t]he question of entrapment is generally one for the jury, rather than for the court." *Mathews*, 485 U.S. at 63. I believe that Allebban has provided sufficient evidence from which a reasonable jury could conclude that the government entrapped him into preparing false receipts. Therefore, he was entitled to a jury instruction on entrapment. I

respectfully dissent from Part III of the majority opinion, and would reverse the judgment of the

district court and remand for further proceedings.