NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0420n.06

Nos. 20-1179/1223

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

FAZULLAH KHAN,

      Defendant-Appellant.

**FILED**
Sep 03, 2021
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

**BEFORE:**    **CLAY, McKEAGUE, and LARSEN, Circuit Judges.**

**CLAY, Circuit Judge.** Defendant Fazullah ("Fazal") Khan appeals his jury trial convictions on four counts of bribery, in violation of 18 U.S.C. § 666, and the sentence subsequently imposed by the district court. For the reasons stated below, we **AFFIRM** Khan's convictions and sentence.

## BACKGROUND

### Factual Background

In 2008, Dan O'Leary was elected supervisor of Washington Township after running on an anti-corruption platform. After taking office, an audit of the town's municipal departments revealed to O'Leary that someone in the Public Works Department had intentionally drawn sewage lines to increase specific property values. Steve Hohensee oversaw the Public Works Department, and O'Leary had already been suspicious of Hohensee based on rumors that Hohensee was involved in public corruption. Sometime later, Mike Magnoli, a local real estate developer, told O'Leary that he was "being muscled" by Hohensee to facilitate a land deal where Hohensee would

acquire property at a lower price than what it was worth. (R. 128 at PageID# 1660.) After speaking with Magnoli, O'Leary reached out to the FBI.

In January 2014, the FBI began an investigation of Hohensee. After the FBI obtained evidence of Hohensee accepting bribes, he agreed to cooperate with the FBI. During an interview with the FBI, Hohensee mentioned Defendant Fazal Khan, the owner of a local engineering firm. In May 2014, the FBI opened a bribery investigation into Khan. Over the course of nine months, the FBI tracked Khan, including wiretapping his phone and recording his conversations with others.

Most of the recorded conversations were between Khan and Hohensee. On May 7, 2014, at the behest of the FBI, Hohensee called Khan, and told him that Washington Township was seeking bids for an engineering contract. Khan responded: "Can you put me in? I'll take care of everybody in that town." (Gov. Ex. 101 at 0:39–0:43.)

In another recorded conversation between Khan and Hohensee, Khan mentioned that he planned to inform O'Leary that he wanted "to take over the Washington" engineering contract. (Gov. Ex. 102T-01.) At the time, Washington Township had a contract with another engineering firm, Giffels Webster, worth over a million dollars annually. In response, Hohensee requested that Khan "let me do my magic" before Khan reached out to O'Leary. (*Id*.) At a later point, Khan expressed to Hohensee that "we need to work out some details." (Gov. Ex. 104 at 0:16–0:18.) Khan explained that with Giffels Webster charging an estimated one million dollars a year, he would make at least $150,000 profit if he received the engineering contract. Khan then suggested that Hohenesse would receive a kickback from that profit if he received the contract and told him that nobody would know about their arrangement.

In yet another recorded exchange between the duo, Khan told Hohensee about a vacant 105 acre property in Washington Township that had a low value due to a lack of water supply. Khan suggested that he would purchase the property along with several other individuals, and as long as Hohensee could "get water there," they would "each make a million dollars." (Gov. Ex. 301-A at 0:46–0:50.) Khan specifically told Hohensee that he did not have to invest any money in the project—his share would be in return for dealing with the water issue.

On June 20, 2014, Hohensee told Khan that "we should plan a trip or something." (Gov. Ex. 201 at 0:00–0:02.) Khan suggested a fishing trip. On August 28, 2014, Hohensee and Khan met up at a local restaurant. Hohensee told Khan that O'Leary was leaving the engineering contract decision up to him. After Hohensee said that he would be announcing a request for proposal, Khan responded, "If you're going to then we need to plan it properly so both of us can make some money." (Gov. Ex. 103T-01.)

At this same meeting, Khan told Hohensee about his arrangements for their fishing trip. He explained that he booked "a high-end resort," and that he was covering all the expenses for the trip. (Gov. Exhibit 204T-02.) Khan also indicated that if they went to the casino, he would provide cash for gambling. He later told Hohensee that he was bringing $1,000 for each of them to use for gambling. Hohensee then told Khan that he was lying to his wife about how he was paying for the trip and asked Khan for cash in advance so he could show his wife that he had the money to cover the trip.

On September 9, 2014, Khan met up with Hohensee, and, as promised, gave him $1,000. Two days later, Khan, Hohensee, and a third individual went on a three day fishing trip, all expenses paid by Khan. After returning from the fishing trip, on September 26, 2014, Hohensee offered to give Khan his gambling proceeds back, but Khan told him to never discuss the trip again.

On October 24, 2014, Hohensee and Khan met up once again. Hohensee informed Khan that he would be retiring but told him, "[D]on't worry. I got you all set up." (Gov. Ex. 105T-01.) Hohensee said he spoke with O'Leary about working with Khan, and said "you're probably going to have to help [O'Leary] out somehow." (Gov. Ex. 105T-02.) Hohensee further told Khan that O'Leary was "looking for about ten grand." (*Id.*) Khan responded, "I'll take care of him. It's a done deal." (Gov. Exhibit 105T-03.)

On November 4, 2014, Khan met with O'Leary. O'Leary expressed to Khan that he would give him the engineering contract but that he was "going to need something too." (Gov. Ex. 106A at 0:10–0:11.) Khan responded, "Whatever you need, it will be taken care of very quietly." (*Id.* at 0:14–0:19.) In a separate conversation, Khan told O'Leary that he would give him 10 percent of the proceeds from all Township contracts he received. In a video of a later meeting, Khan can be seen handing O'Leary an envelope. An FBI agent later testified that there was $10,000 in cash inside the envelope.

### Procedural Background

Khan was charged with four counts of bribery under 18 U.S.C. § 666. The first count related to him providing O'Leary with $10,000. The second count related to him providing Hohensee with $1,000 prior to their fishing trip. The third count related to him funding the fishing trip. The fourth count related to Khan's offer to give Hohensee a secret interest in the parcel of land that needed a water supply.

Trial began on July 8, 2019. Khan conceded that he engaged in the charged conduct. Instead of contesting any of the bribes, Khan raised an entrapment defense, and argued that, in unrecorded conversations, Hohensee and O'Leary threatened his existing projects in Washington Township in order to force him to pay them bribes.

The jury did not buy Khan's defense, and he was convicted on all four counts. The district court calculated Khan's Guidelines Sentencing range to be 151 to 188 months of imprisonment. The district court varied downward and imposed a sentence of 132 months. This timely appeal followed.

**DISCUSSION**

**I.      Testimony About Sources Implicating Khan in Prior Uncharged Briberies**

Agent Vose was the lead FBI agent assigned to Khan's case. During cross-examination of Vose, Khan's counsel asked him: "Did anybody indicate to you whether it be Hohensee or O'Leary or any public official in Washington Township, prior to your investigation, that Fazal Khan had bribed anybody?" (R. 128 at PageID# 1625.) Vose responded: "From Washington Township? No, not from Washington Township." (*Id.* at PageID# 1626.)

Seeking to clarify Vose's answer, on redirect examination, the government asked Vose: "[Y]ou were asked a question about whether you had prior information, source information indicating that Fazal Khan was bribing public officials in Washington Township and you said no, correct?" (*Id.* at PageID# 1643–44.) After Vose responded, "Oh, in Washington Township. Yeah. I answered that no," the government asked him: "Did you have source information that Mr. Khan was bribing officials in other townships?" (*Id.* at PageID# 1644.) Vose replied, "Yes." (*Id.*)

At this point, Khan's counsel objected on hearsay grounds. The district court overruled the objection, explaining that "it's an illumination of answers given on cross-examination. It's not inappropriate." (*Id.*) Vose then explained that he had source information that Khan had bribed public officials in Shelby Township, Macomb Township, Lenox Township, and the Village of New Haven.

On appeal, Khan argues that Vose's testimony both violated the rule against hearsay and his rights under Confrontation Clause of the Sixth Amendment. Because Khan objected to Vose's testimony on hearsay grounds, we review the district court's evidentiary ruling "for abuse of discretion." *United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) (citing *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir. 1999)). "A district court abuses its discretion when it applies the wrong legal standard or misapplies the correct legal standard such that we are left with a definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Carter*, 779 F.3d 623, 627 (6th Cir. 2015) (citations and quotations omitted). However, even when a district court abuses its discretion, "[n]on-constitutional errors are subject to the Rule 52(a) harmless error analysis, in which the government must show by a preponderance of the evidence that the error did not materially affect the verdict." *United States v. Young*, 847 F.3d 328, 349–50 (6th Cir. 2017) (citation omitted); *see also* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity or variance that does not affect substantial rights must be disregarded.").

By contrast, because Khan failed to object to Vose's testimony on Sixth Amendment grounds, we review Khan's Sixth Amendment claim for plain error. *See United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004). "To establish plain error, a defendant must demonstrate: (1) error, (2) that was plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Collins*, 799 F.3d 554, 574–75 (6th Cir. 2015) (quoting *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007)). In "the ordinary case," an error "affect[s] . . . substantial rights" if "it affected the outcome of the district court proceedings." *United States v. Ataya*, 884 F.3d 318, 322 (6th Cir. 2018) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

## A. Hearsay

Under Federal Rule of Evidence 801(c), "hearsay" is defined as a statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." But even when an in-court statement qualifies as hearsay under Rule 801(c), "where one party has 'opened the door' on an issue, the opponent, in the trial court's discretion, may introduce evidence on the same issue to rebut any false impression that may have been created by the earlier admission of evidence." *United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002) (citing *United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994)); *see also United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002).

On cross-examination, Khan's counsel elicited misleading testimony indicating that, prior to his investigation, Vose had no source information implicating Khan in bribery activities. Khan's counsel specifically asked whether Vose had been told by anyone "in Washington Township, prior to your investigation, that Fazal Khan had bribed anybody?" (R. 128 at PageID# 1625.) When Vose sought to clarify if Khan's counsel meant whether "anybody" had "indicate[d]" that to him, Khan's counsel reiterated that he was limiting his question to anybody specifically "[i]n Washington Township." (*Id.* at PageID# 1625–26.) Therefore, because Khan opened the door to the issue of whether Vose had source information before beginning the investigation, the district court did not abuse its discretion in allowing the government to correct the false impression left by Khan's cross-examination.[1]

## B. Confrontation Clause

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S.

---

[1] In any event, as explained below, any error in admitting this testimony was harmless.

Const. amend. VI. In *Crawford v. Washington*, the Supreme Court established that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. 36, 53–54 (2004). While the Supreme Court has defined "testimonial" "in varying ways," *United States v. Miller*, 982 F.3d 412, 434–35 (6th Cir. 2020), we have held that statements "'made to the authorities who will use them in investigating and prosecuting a crime, . . . made with the full understanding that they will be so used,' are precisely the sort of accusatory statements the Confrontation Clause was designed to address," *Cromer*, 389 F.3d at 674 (quoting Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011, 1025 (1998)).

Although the government does not dispute that the statements attributed to Vose's sources about Khan's uncharged bribes were testimonial, it argues that the Confrontation Clause was not violated because Khan opened the door to the line of questioning. However, whether the defendant "invited or provoked" a testimonial statement "as part of a failed defense strategy" is not relevant to the Confrontation Clause inquiry. *Id.* at 678. While it is true that Khan opened the door to Vose's testimony, "the mere fact that [Khan] may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation." *Id.* at 679.

Nonetheless, Khan is not entitled to relief on plain error review because the challenged statements did not affect the outcome of the trial. Khan's defense at trial was that he was entrapped by the government. An entrapment defense "requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." *Khalil*, 279 F.3d at 364 (citing *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990)).

"An 'inducement' consists of an 'opportunity' *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Hood*, 811 F. App'x 291, 298 (6th Cir. 2020) (citing *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010)). "[M]erely afford[ing] an opportunity or facilities for the commission of the crime" is not enough. *Mathews v. United States*, 485 U.S. 58, 66 (1988)). Thus, the government's suggestion that the defendant commit the crime does not suffice to establish government inducement. *See United States v. Sadiqullah*, — F. App'x —, 2021 WL 3043271, at \*6 (6th Cir. July 20, 2021).

"Predisposition . . . focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63 (internal quotations and citations omitted). It is "by definition, the defendant's state of mind *before his initial exposure to government agents*." *United States v. McLernon*, 746 F.2d 1098, 1112 (6th Cir. 1984) (internal quotations and citation omitted). In determining whether a defendant was predisposed to commit the crime, we weigh:

> [1] the character or reputation of the defendant, including any prior criminal record;
> [2] whether the suggestion of the criminal activity was initially made by the Government; [3] whether the defendant was engaged in the criminal activity for profit; [4] whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and [5] the nature of the inducement or persuasion supplied by the government.

*Khalil*, 279 F.3d at 365 (quoting *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991)). "The most important factor in determining the lack of predisposition . . . is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducements." *McLernon*, 746 F.2d at 1113 (internal quotations and citation omitted).

Considering the wealth of recordings in this case, the violation of Khan's Confrontation Clause rights did not affect the outcome of his trial. The recordings demonstrate that the

government did nothing more than provide Khan with an opportunity to engage in bribery. For example, when Hohenesee mentioned that Washington Township was soliciting bids for its engineering contract, Khan immediately responded: "Can you put me in? I'll take care of everybody in that town." (Gov. Ex. 101 at 0:39–0:43.) And given the extensive recordings showing Khan's initiation of, and eagerness to engage in, the bribery schemes, there is no likelihood that absent Vose's challenged testimony the jury would have believed Khan's unsupported testimony that he was merely submitting to unrecorded undue pressure. Thus, the government inducement element is alone dispositive because the government "merely afforded an opportunity" for Khan to commit the crime. *United States v. Poulsen*, 655 F.3d 492, 502 (6th Cir. 2011).

Likewise, Vose's testimony did not affect the predisposition element. Although Khan did not have a criminal record, the recordings demonstrate that the four charged briberies were all schemes suggested by Khan, he engaged in the briberies for the purpose of making a profit, he did not exhibit any reluctance to commit the crime, and there is no plausible evidence that the government engaged in any undue persuasion to convince Khan to engage in bribery.

Moreover, Vose's testimony did not affect Khan's entrapment defense because the recordings show Khan bragging about uncharged bribes to public officials, including that he gave the Macomb County public works commissioner, Anthony Marrocco, "like five grand a year" because Marrocco "gives [him] a lot of work," and "[y]ou have to" "give a little back." (Gov. Ex. 400T-02.) He also told Hohensee that he once "had to pay somebody 40 grand" after Marrocco's deputy, Dino Bucci "got into a situation" to "take care of it." (Gov. Ex. 402T-01.) Therefore, on plain error review, because the violation of Khan's Confrontation Clause rights did not affect the outcome of his trial, he is not entitled to relief. *See United States v. Warman*, 578 F.3d 320, 347 (6th Cir. 2009).

## II.       Guilt Assuming Hypothetical

At trial, Joseph Romano, a local politician, testified as a character witness that he believed Khan to be an ethical businessperson. On cross-examination, the government asked Romano, "Would your opinion change if you watched a video on that screen showing . . . Mr. Khan handing . . . $10,000 in cash to Dan O'Leary . . . to get an engineering contract?" (R. 125 at PageID# 1228.) As the government attempted to play the video, Khan's lawyer objected because the question "[called] for an opinion based on evidence that this jury is going to make a decision on based on an entrapment defense." (*Id.* at PageID# 1229.) The district court overruled the objection, stating, "It's cross-examination on the precise point and the question asked in direct examination." (*Id.*) The government then asked Romano to "assume that this constitutes $10,000 in cash that Mr. Khan gave to a public official. Knowing this, seeing this video, does this change your opinion whether or not as of today, Mr. Khan is an ethical person?" (*Id.* at PageID# 1231.) Romano responded, "[D]o I think that would be ethical? Absolutely not." (*Id.*)

On appeal, Khan argues that the government inappropriately asked Romano a guilt assuming hypothetical. But Khan concedes that our review of this issue is for plain error because his counsel did not object on this ground.

We have held that it is "error to allow the prosecution to ask the character witness to assume defendant's guilt of the offenses for which he is then on trial." *United States v. McGuire*, 744 F.2d 1197, 1204–05 (6th Cir. 1984) (citing *United States v. Polsinelli*, 649 F.2d 793, 795 (10th Cir. 1981); *United States v. Morgan*, 554 F.2d 31 (2d Cir. 1977); *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977)). This is because such "hypothetical questions str[ike] at the very heart of the presumption of innocence." *Candelaria-Gonzalez*, 547 F.2d at 294.

Although the government asked Romano to assume that the video showed Khan giving $10,000 to a public official in exchange for an engineering contract, Romano's answer did not "affect[] the outcome of the district court proceedings," *Ataya*, 884 F.3d at 322, because Khan conceded that the video showed him giving the money. His defense was that he had been entrapped by the government into committing the act—that is, Khan essentially admitted that the video showed him committing an unethical act. Therefore, even if the district court erred, Khan cannot obtain relief under plain error review.

### III. Guilt By Association Testimony

Agent Beeckman was another FBI agent on Khan's case. On cross-examination of Beeckman, Khan's counsel sought to establish that, in bribery cases, even when it could be proven that money was given to a public official, "business persons . . . were never charged, and were perceived, and the argument was, that they were victims in that case." (R. 124 at PageID# 1077.)

On redirect examination, the government attempted to respond to the implication that Khan's prosecution was an outlier—that people in his shoes were typically viewed as victims. To that end, the government asked Beeckman whether it was "common" for bribe payers to be prosecuted. (*Id.* at PageID# 1123.) Beeckman replied, "Yes," and went on to explain that "this investigation" is "a spin-off investigation that's part of a much larger investigation involving other public officials and other contractors. So there are quite a number of other people involved that have been investigated, prosecuted. . . . [a]nd convicted." (*Id.* at PageID# 1123–24.)

The government then tried to ask Beeckman about several specific businesspersons who had been convicted as part of the larger public corruption investigation. Khan's counsel objected, arguing that this line of questioning was irrelevant and unduly prejudicial. The district court overruled the objection because "[t]he matter was raised in cross-examination and explored in

some detail" and so it was "fair to clarify the matter with the witness." (*Id.* at PageID# 1124–25.) Agent Beeckman proceeded to name five individuals who had been charged with bribing public officials, and also testified that "about 22 people" had been prosecuted during the course of the FBI's investigation and that "the vast majority of them are disposed of already, convicted by either a plea or by trial." (*Id.* at PageID# 1126.)

On appeal, Khan argues that the district court abused its discretion in allowing this evidence to be introduced because it was irrelevant, unduly prejudicial, and constituted improper guilt by association evidence. "Evidence is only admissible if it is relevant, that is, if it tends to demonstrate that a fact of consequence to the action is more or less probable than it would be without the evidence." *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006) (citing Fed. R. Evid. 401, 402). Thus, "establishing guilt by association is . . . an improper manner by which to obtain a conviction, and . . . the prosecution may not use proof of another's conviction as evidence against the accused." *Chance*, 306 F.3d at 385–86 (citations omitted); *see also United States v. Shalash*, 259 F. App'x 754, 758 (6th Cir. 2008). "Furthermore, a trial court may exclude evidence even when relevant if 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Lopez-Medina*, 461 F.3d at 741 (quoting Fed. R. Evid. 403).

Khan's arguments are unavailing. The government was merely responding to Khan's counsel's cross-examination that sought to establish that people like Khan were generally considered to be victims and were never prosecuted. Once Khan's counsel implied that Khan's prosecution was an unjustified outlier, "the government had ample justification to introduce" testimony establishing that other businesspersons were also charged with bribery because Khan's counsel "opened wide the door to its relevance." *United States v. Gardner*, 887 F.3d 780, 785 (6th

Cir. 2018). "As we have noted in the past, '[w]hen a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject.'" *United States v. Ramos*, 861 F.2d 461, 468–69 (6th Cir. 1988) (quoting *United States v. Peco*, 784 F.2d 798, 805 (7th Cir. 1983)). Therefore, "[w]e cannot say that the district judge abused his discretion in deciding that the redirect testimony was relevant in light of the defense's cross-examination." *Id.* (quoting *Peco*, 784 F.2d at 805). And the district court did not abuse its discretion in concluding that the testimony was not unduly prejudicial because Beeckman's testimony did not imply that Khan was guilty because these other people had been found guilty—the testimony only rebutted Khan's counsel's argument that Khan was an outlier, and there was no indication Khan had any dealings with (or even knew) these other people such that their convictions would establish Khan's guilt.

### IV. Cumulative Errors

Khan argues that even if none of the district court's alleged errors alone entitle him to a new trial, we should grant him a new trial because "[t]he cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012) (citing *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)).

The district court erred in admitting Vose's testimony about his sources implicating Khan in uncharged briberies, and arguably erred in allowing Romano to testify about whether his opinion of Khan's character changed after watching him commit the charged bribery. But as explained above, Romano's testimony about whether the conduct in the video was ethical had absolutely no impact on the trial because Khan conceded that the video showed him committing an unethical act. Thus, we are left with Vose's testimony alone. And, as also explained above, the admission of

Vose's challenged testimony was not alone enough to affect the outcome of the trial. Therefore, Khan is not entitled to relief based on cumulative error.

## V.     Sentencing Calculation

Khan argues that the district court erred in calculating his Sentencing Guidelines range. "This Court reviews sentences for both procedural and substantive reasonableness under the abuse of discretion standard." *United States v. Jones*, 641 F.3d 706, 711 (6th Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "Procedural reasonableness review involves 'ensur[ing] that the district court properly calculated the Guidelines range, did not treat the Guidelines as mandatory, considered the factors set out in 18 U.S.C. § 3553(a), did not select a [sentence] based on clearly erroneous facts, and adequately explained its sentence."' *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (quoting *United States v. Cunningham*, 669 F.3d 723, 728 (6th Cir. 2012)).

According to the Sentencing Guidelines, a bribery defendant's offense level is increased based on "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest." USSG § 2C1.1(b)(2). Where, as here, if there is "more than one incident of bribery . . . , the applicable amounts under subsection (b)(2) . . . are determined separately for each incident and then added together." *Id.* cmt. n.2.

"[L]oss is the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n.3(A). Significantly, "[t]he court need only make a reasonable estimate of the loss." *Id.* cmt. n.3(C); *see also United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) ("It need not be determined with precision."). And because "[t]he sentencing judge is in a unique position to assess the evidence and estimate

the loss based upon that evidence . . . , the court's loss determination is entitled to appropriate deference." *Id.* (citing 18 U.S.C. § 3742(e), (f)). Therefore, "[w]e review a district court's loss calculations under the Guidelines for clear error," and "[i]n challenging the court's loss calculation, [a defendant] must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *Gray*, 521 F.3d at 543 (quoting *United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001)).

The presentence report calculated the loss from Khan's bribery as "$239,991.00 for the engineering contract, $393,750.00 for the 105 acre land deal and at least $1,000.00 for the fishing trip as the overall value could not be determined." (R. 10-1 at p.7.) To determine the value of the engineering contract, the presentence report explained that the "contract was worth at least $1,000,000.00 per year. In 2015, [Giffels Webster] billed Washington Township $1,599,941.00. A conservative estimate of the profit for Khan and his business at 15%, per the government, would result in a profit of $239,991.00." (*Id.* at p.6.) This 15 percent amount was drawn from one of the recordings in which Khan can be heard saying that he would receive $150,000 for a $1 million contract. And because the calculated loss totaled more than $550,000 but less than $1,500,000, the presentence report increased the offense level by fourteen.

The district court based its loss calculation of the engineering contract on the time O'Leary still had in office, which would have resulted in a two-year contract for Khan. Assuming "that there was a diminished level of business in the succeeding year of Mr. O'Leary's term of office," the district court estimated that the second year contract value would be $1 million. (R. 154 at PageID# 2514.) When added together with the loss associated with the other counts of bribery, the district court found a reasonable estimate of the loss to be at least $640,000. Therefore, the district

court agreed with the presentence report's conclusion that the total loss amount exceeded $550,000.

Khan argues that the district court should not have relied on the $1,599,941 billed by Giffels Webster in 2015 because Khan's firm had different rates. Instead, to calculate the loss amount, Khan argues that the district court should have used the $10,000 paid to O'Leary, or, alternatively, the $150,000 that Khan believed, per the recording, that he would make for a $1 million contract. Khan also argues that it was speculative for the district court to add $1 million for the second year because it was not certain that there would be a second year to the contract.

However, the district court's loss calculation was "not outside the realm of permissible calculations." *Gray*, 521 F.3d at 543. The court used the amount of money Washington Township paid its current engineer, who was in the same geographical area as Khan and performed similar work, to evaluate how much money Khan stood to make after completing the bribe. It then extrapolated that Khan would maintain that contract for the two years O'Leary still had in office. That calculation was not unreasonable, given that Giffels Webster entered into its contract with Washington Township in 2009. Further, the district court even reduced the amount expected in the second year of the contract to account for "a diminished level of business." (R. 154 at PageID# 2514.) Therefore, the district court did not abuse its discretion in sentencing Khan, and his guideline range does not reflect clear error.

## VI.    Ineffective Assistance of Counsel

Finally, Khan argues that his trial counsel was ineffective because he failed to make the proper objections to the challenged portions of Vose and Romano's testimonies. While counsel objected to both, he did not raise a Sixth Amendment challenge to Vose's testimony, and he did not assert that the government asked Romano a guilt assuming hypothetical.

"To obtain relief on the basis of ineffective assistance of counsel, the defendant as a general rule bears the burden to meet two standards. First, the defendant must show deficient performance—that the attorney's error was 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Second, the defendant must show that the attorney's error 'prejudiced the defense.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910, (2017) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "In the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 1911 (quoting *Strickland*, 466 U.S. at 687).

We have "adopted a general rule that a defendant may not raise ineffective assistance of counsel claims for the first time on direct appeal," *United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012) (cleaned up) (quoting *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005)), because when "brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose," *Massaro v. United States*, 538 U.S. 500, 504–05 (2003). For instance, "the appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse." *Id.* at 505. Thus, "a motion brought under [28 U.S.C.] § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." *Id.* at 504. However, in "rare instances," *United States v. Yisrael*, 355 F. App'x 933, 934 (6th Cir. 2009), we may nonetheless "choose to hear the issue on direct appeal if we find that the parties have adequately developed the record," *Ferguson*, 669 F.3d at 762.

This is one of those "rare instances." *Yisrael*, 355 F. App'x at 934. Since we explained above that the introduction of the challenged portions of Vose and Romano's testimonies did not affect the outcome of Khan's trial, even assuming that Khan's trial counsel was deficient for failing to make objections based on the arguments that Khan pursues on appeal, Khan cannot satisfy the prejudice prong of the *Strickland* standard. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004) (concluding that the standard for the third prong of plain error is the same as the prejudice standard for ineffective assistance claims under *Strickland*). Accordingly, we deny Khan's ineffective assistance of counsel claims.

## CONCLUSION

For the reasons stated above, Khan's convictions and sentence are **AFFIRMED**.